**Charles E. PARKER, Marilyn E. Parker, Robert I. Meyer and Jane M. Meyer**

v.

**The UNITED STATES.**

No. 79–72.

United States Court of Claims.

Feb. 22, 1978.

**18.** *See* note 17, *supra.*

**43**

Charles E. Parker, pro se, for plaintiffs.

David C. Hickman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed December 30, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

OPINION

PER CURIAM:

This case comes before the court on plaintiffs' exceptions to the recommended decision of Trial Judge Lloyd Fletcher, filed December 30, 1976, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the same as the basis for its judgment in this case. It is, therefore, concluded that plaintiffs are not entitled to recover and their petition is dismissed.

OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge.

The taxpayers in this suit for refund of Federal income taxes are Robert I. Meyer and Marilyn E. Parker, brother and sister, and they seek a refund of such taxes and interest thereon which they paid for the calendar year 1965.[1] In 1965, Marilyn and Robert had each received $175,000 in cash as a settlement of a California Superior Court lawsuit. That suit, brought by them against various members of their family (the Segerstroms), asserted that Robert and Marilyn had been improperly excluded from sharing in the estate of their grandmother, Bertha Segerstrom. They demanded a judgment declaring them owners of certain property interests allegedly held by their grandmother, as well as an award of certain compensatory and punitive damages for lost enjoyment and fraudulent concealment. The Internal Revenue Service determined that the settlement transaction resulted in the sale or exchange of a capital asset, namely, the taxpayers' "claim" against Bertha's estate, that a substantial amount of capital gain, attributable to the apprecia-

1. The spouses of these taxpayers are also plaintiffs in this action, but apparently so only because joint income tax returns were filed by each couple for the year in question.

tion of the claim over the some twenty years it remained unasserted was thereby realized, and that this gain amounted to 75 percent of the settlement proceeds.

The taxpayers disagreed entirely with the Service's analysis of the tax consequences of the settlement. After paying tax deficiencies of $16,772.23 plus interest of $3,585.60 and $17,445.57 plus interest of $3,729.53, respectively, Marilyn and Robert filed timely claims for refund, which the Service formally disallowed. They then timely filed their petition in this court for a refund of the amounts so paid. They say that under the doctrine of *Lyeth v. Hoey,* 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119 (1938), they are clearly entitled to exclude from taxable income the entire settlement proceeds as being a taxfree "inheritance" within the meaning of Section 102(a) of the Internal Revenue Code of 1954, reading:

> (a) General rule.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance. 26 U.S.C. § 102(a).

The Government continues to take essentially the same position as the Service conferee had done in his analysis of the settlement transaction and has treated the receipt of the settlement proceeds as gain realized on the sale or exchange of a capital asset. While the Government's argument has considerable merit and an appealing simplicity, it seems to me subject to some criticism in that it tends to gloss over the Supreme Court's general approach to § 102(a) in *Lyeth v. Hoey, supra,* particularly as elaborated in later decisions by the lower Federal courts. As will be shown, one result of this has been a faulty allocation of the settlement proceeds. However, to the extent there was error, it was committed in favor of the taxpayers, and they have failed completely to show any overpayment of their 1965 Federal income tax-

es. Accordingly, under the landmark decision of *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932), they are not entitled to recover the refunds claimed for that year. See, also, *Dysart v. United States,* 340 F.2d 624, 169 Ct.Cl. 276 (1965).

The facts of the case are somewhat complicated by the large size of the Segerstrom family of which taxpayers are a part.[2]

C. J. Segerstrom was a farmer engaged mostly in the cultivation of lima beans. He and his wife, Bertha, had eleven children, one of whom (Esther) was the mother of plaintiffs, Robert Meyer and Marilyn Parker. Some years prior to his death in 1928, C. J. had formed a partnership with four of his sons as equal partners. They continued the operation of the farming business under the partnership name of C. J. Segerstrom & Sons, and over the years the enterprise expanded considerably. By 1944, it was farming about 2,000 acres, all of which was then agricultural land in Orange County, California. Owing, however, to an influx of defense related industries and accompanying population growth, the character and value of the partnership property experienced a rather spectacular change. Much of the acreage was being serviced by new freeways, and industrial parks and shopping malls began to develop. By the time of the commencement of the litigation referred to above the value of the Segerstrom properties was estimated to be somewhere close to $60,000,000.

Bertha Segerstrom died in January 1944 survived by eight of her children and by Robert and Marilyn, children of her deceased daughter, Esther. Bertha apparently died intestate,[3] and the record discloses no formal administration of her estate although much later there was an inheritance tax proceeding conducted in the Orange County Superior Court. Partnership in-

2. Counsel for the parties were successful in agreeing upon a partial stipulation of facts. In addition, a trial was conducted before Trial Judge Charlotte Murphy in Los Angeles, California, on March 24 and 25, 1975. The findings based upon these proceedings are detailed in the Findings of Fact which are summarized here only to the extent necessary to understand the reasons for the conclusions reached in this opinion.

3. In 1951 an inheritance tax appraiser referred to her as having died "testate," but the record here indicates this to have been in error.

come tax returns for the family partnership of C. J. Segerstrom & Sons were filed for years following C. J.'s death in which returns Bertha was shown as holding a one-fifth interest therein. However, Bertha's partnership status does not appear to have been otherwise recognized by her sons except possibly for tax purposes, and it is unclear on this record whether she was, in fact, a member of the family partnership. More clear is the fact that there was never a formal dissolution or winding up of the partnership affairs at her death.

Indeed, as previously stated, in the usual sense, there was no formal administration of Bertha's estate at all.[4] However, in 1951, there was a Superior Court proceeding for the determination of state inheritance taxes on certain real property received by Bertha's surviving children shortly after her death. According to the state tax assessor's report in that proceeding, this property was transferred pursuant to a "gift deed" executed in 1930 but recorded in 1944 after Bertha's death. By this deed, the surviving eight of Bertha's eleven children appear to have received a joint tenancy with right of survivorship in a property known as the "Home Ranch," a 110-acre farm operated by the family partnership and owned by Bertha. Marilyn and Robert were not mentioned in such deed and were not involved in the 1951 inheritance tax proceeding in any way, nor were they shown as entitled to any share of Bertha's putative partnership interest or any other asset of Bertha. In fact, although it was reasonably clear that they were two of Bertha's numerous heirs-at-law, no effort was made to inform them of the inheritance tax proceeding or of any other matter involving Bertha's estate.[5]

In the 1951 inheritance tax proceeding referred to above, six of Bertha's children filed their petition in the Orange County Superior Court representing that no administration had been had upon Bertha's estate but that in 1930 she had executed a certain deed of gift conveying certain real estate (the Home Ranch) to her then living children as joint tenants with right of survivorship. The petition further represented that the grantees named in the deed comprised all of Bertha's heirs-at-law and that one of them, Ida Segerstrom, had predeceased Bertha. No other property interest of Bertha was mentioned but the petitioners believed that the transfer of the Home Ranch was subject to California inheritance tax which they desired to be determined.

Whereupon the court appointed an inheritance tax appraiser and directed him to report the amount of tax due, if any, on such transfer. In due course, the appraiser reported to the court that the fair market value of the property at the date of Bertha's death was $122,000. After deducting therefrom the funeral expenses, unpaid taxes, attorneys' fees, court costs, unpaid balances of trust deeds, and Federal tax, he arrived at a "clear market value" for the property of $78,183. Bertha's eight surviving sons and daughters thereupon paid their aliquot share of the resulting inheritance tax totaling $763.68.

As stated, Marilyn and Robert, Bertha's other heirs, were completely unaware of the inheritance tax proceeding. However, in 1963, Marilyn's husband, Charles E. Parker, who was a title attorney for the First American Title Company, happened to examine the probate file for the estate of Ida Segerstrom, a daughter of Bertha who predeceased her. Reference was made in this file to Bertha's estate and to the 1930 deed of gift in which Ida was an original donee. Charles was intrigued by what appeared to him to be inconsistencies in these records. He and Marilyn then consulted her brother, Robert. While he knew nothing about the matter, he was, of course, interested.

---

**4.** It does appear that more than 20 years after Bertha's death, her son, Harold, did file a petition for letters of administration on her estate.

**5.** From the record herein, it is not clear why older members of the Segerstrom family tended to ignore the interests of these two grandchildren of Bertha. It may well be that, as laymen, they simply failed to appreciate the heirship status of both Robert and Marilyn who were very young children when their mother died and who thereafter lived and grew up with families other than the Segerstroms.

Charles continued his investigation and consulted with his colleagues at the title company. Marilyn and he also made inquiries of members of the Segerstrom family.

The result of all this was the commencement of litigation. In July 1964, Harold T. Segerstrom, et al. filed a Complaint to Quiet Title, naming Robert, Marilyn, and unknowns as defendants.

Marilyn and Robert counterclaimed in the quiet title suit and joined many other relatives as parties defendant to the cross-complaint. This cross-complaint, as later amended, alleged not only that Marilyn and Robert were entitled to a share of the Home Ranch, but also that they were entitled to a share of Bertha's partnership interest, that they were entitled to lost income since 1944, and that the cross-defendants had defrauded them and engaged in a continuing conspiracy of concealment to deprive them of their rightful interest. The taxpayers demanded $10 million dollars in punitive damages for the torts. They also demanded a declaration of ownership in the property withheld from them, i. e., the lands and the partnership interest, plus $5 million dollars for lost income.

The entire suit, including the cross-complaint, proceeded to the pretrial stage, and extensive depositions were taken in preparation for trial. However, the suit was settled. The settlement was accomplished partly because one of the older Segerstroms who had been scheduled for deposition was in frail health, partly because a lis pendens which taxpayers had filed against all partnership property, even though previously removed, was nevertheless hampering significant business negotiations partly because there had been uncovered another gift deed to the Home Ranch (this one executed and predating the 1930 gift deed but not filed until 1965), and partly because the suit was splitting the family apart as well as affecting its intricate development negotiations. Marilyn and Robert each received $175,000 as their one-half share of the total settlement, and it is the taxability of this receipt which is presently in issue here.

In a perceptive analysis written before the Supreme Court's decision in Lyeth v. Hoey, supra, a distinguished tax commentator aptly described the nature of receipts flowing from a compromise agreement entered into to avoid a will, or other post-mortem, contest as "irritatingly elusive of definition." Paul, "Tax Status of Will Contestants," Selected Studies in Federal Taxation (2d Series) pp. 305, 328 (1938). The Supreme Court endeavored to correct the existing confusion by its decision in the Lyeth case.

There the taxpayer, Lyeth, was a grandson and heir under Massachusetts law of Mary Longyear, who left him and her other heirs small legacies but gave the residue of her estate of over $3,000,000 in trust to preserve "the records of the earthly life of Mary Baker Eddy," the founder of the Christian Science religion. Lyeth and the other heirs opposed probate of the will on grounds of lack of capacity and undue influence. Before the case came to trial, a compromise agreement was entered into by all parties, approved by the Court and incorporated in its decree admitting the will to probate as modified by the agreement. Lyeth's distributable share of the residue under the compromise was valued at over $140,000, all of which the Commissioner treated as ordinary income in the year of receipt. The case came up on action for refund of over $56,000 in taxes paid on this award, the Second Circuit siding with the Commissioner in 96 F.2d 141, and the Supreme Court granting certiorari on the resulting conflict with the Fourth Circuit in Magruder v. Segebade, 94 F.2d 177 (4th Cir. 1938).

The Court first discarded the argument that under state law the payment would be deemed to have been made by purchase (i. e., a contract bargain) rather than by inheritance. The Court recognized that state law determines who are the heirs, the validity of the will, and the procedure for probate and compromise. But once the taxpayer is so determined to be an heir and has so received payment under valid compromise, whether what he has received has

been "acquired by gift, bequest, devise or inheritance" under the Code section quoted above is then properly a federal question in order to give uniformity to the application of the Code.[6]

The Court then ruled that, in passing the Code exemption above, Congress used comprehensive terms embracing all acquisitions in the devolution of a decedent's estate. This was such an acquisition because of Lyeth's status as an heir-at-law. The Court elaborated the point at 305 U.S. at p. 196, 59 S.Ct. at p. 159:

> There is no question that petitioner obtained that portion, upon the value of which he is sought to be taxed, because of his standing as an heir and of his claim in that capacity. It does not seem to be questioned that if the contest had been fought to a finish and petitioner had succeeded, the property which he would have received would have been exempt under the federal act. Nor is it questioned that if in any appropriate proceeding, instituted by him as heir, he had recovered judgment for a part of the estate, that part would have been acquired by inheritance within the meaning of the act. We think that the distinction sought to be made between acquisition through such a judgment and acquisition by a compromise agreement in lieu of such a judgment is too formal to be sound, as it disregards the substance of the statutory exemption. It does so, because it disregards the heirship which underlay the compromise, the status which commanded that agreement and was recognized by it.

The rule thus established by *Lyeth* seems but a specialized application of the familiar concept that, in determining the tax characteristics attributable to amounts received under a court judgment, the crucial question to be resolved is "In lieu of what were the damages awarded?" *Raytheon Production Corp. v. Commissioner of Internal Rev-*

enue, 144 F.2d 110, 113 (1st Cir. 1944), cert. den. 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944). *Lyeth* established that the question is equally important in determining the true nature of proceeds received in settlement of estate litigation.

Thus, it is clear that the ultimate question to be resolved in the present case must be this. In lieu of what did Marilyn and Robert receive $350,000 in settlement of their cross-complaint against the other members of the Segerstrom family. From the discussion below, it will become apparent that the answer to this deceptively simple question is far from easy.

The Government's approach to the "in-lieu-of-what" test is objectionably narrow. It would restrict the *Lyeth v. Hoey* doctrine to a situation where the settlement proceeds constitute a portion of the same assets which the caveator-heir would have received either by direct inheritance or by prevailing in his lawsuit to recover such inheritance. It is true that on its particular facts, *Lyeth* did involve a settlement under which the proceeds received by the heir were for the most part an in-kind distribution. However, this circumstance does not prevent application of the *Lyeth* principle to a cash settlement in lieu of an in-kind distribution. See, for example, *United States v. Gavin*, 159 F.2d 613 (9th Cir. 1947) where in the settlement of a will contest, the claiming heiress received a substantial sum of money from the other heirs in lieu of her claimed percentage interest in the decedent's real estate. The Government made much the same arguments there as here, but the Tenth Circuit Court of Appeals rejected them as contrary to *Lyeth v. Hoey* and held that the cash settlement proceeds were property acquired by "inheritance" so as to be exempt from income tax.[7] See, also, Schenck, "Tax Effects of Will Contests and Compromises," 1961 Tul. Tax Inst. (10th Annual) 214, and Fouts, "Pay-

---

**6.** This general proposition is, of course, well settled. See, *Burnet v. Harmel*, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932) and the discussion in Michaelson, "Tax Effects of Estate Contests," 16 N.Y.U.Tax Inst. 1021 (1958).

**7.** The Government's failure to mention the very apposite *Gavin* case in its brief here probably is indicative of a complete disagreement with the case.

ments Received in Settlement of Litigation and Claims," 25 N.Y.U. Tax Inst. 555 (1967).

The Government, however, relies heavily on *White v. Thomas*, 116 F.2d 147 (5th Cir. 1941) in support of its position that the *Lyeth* principle has no application here. In the *White* case, the taxpayer had filed suit against an estate claiming that, during their lifetimes, the decedent and her husband had given him a 124,000-acre ranch. He bore no family relationship whatever to the decedents but was their good friend and house companion. The dispute was settled by a compromise agreement whereby the executors paid the taxpayer $125,000 in exchange for his release of all claims against the estate. He asserted that the entire amount was exempt from income tax under *Lyeth*, but the Fifth Circuit disagreed, stating:

> . . . When what is received by a compromise is a part of the very thing claimed, the assertion is correct. If White, claiming all the ranch as a gift, had been conceded part of it, the land he thus got would stand as a gift. But in this case he got no land, but money. Yet he never claimed the Shannons had given him any money. The executors and trustees had no authority to give him anything, and did not intend to. They paid him money for the release of the right which he claimed in the land. White sold that right, and conveyed it by suffering the adverse judgments. He converted it into cash; and the gain from the conversion of a gift is taxable, though the receipt of the gift originally was not. He did not sell the land itself, for he had neither title nor possession. He could not deduct the cost of the land to the Shannons, for they never parted with it and no proof of their cost was made. He sold only his claim to recover it, which was in the nature of an incumbrance on the title,

at a price which was only a fraction of the value of the land; and that claim he does not say cost him anything. What he received is income. 116 F.2d 147–8.

Despite the rather sweeping language just quoted, the *White* case is simply not in point here because of its significantly different facts. Unlike the present case, the taxpayer there was not an heir in any way so there could be no possible claim of entitlement to anything by way of "inheritance." Clearly, there was no "devise" of the land to him, and his claim that he was the donee of an oral *inter vivos* "gift" thereof equally clearly could not convey a valid title to real estate and was therefore ineffectual at best. Small wonder, then, that the court could "perceive no sustainable view whereby the money received would not be taxable as income." 116 F.2d 148.

From what has been said, it is concluded that the principles established by *Lyeth v. Hoey* have at least some application to the facts of the present case. This is not the end of the matter, of course, since it does not follow that *Lyeth* automatically exempts from tax the entire amount received by plaintiffs under the compromise agreement. There remains for consideration the impact, if any, of the "in-lieu-of-what" rule referred to above, and this necessarily requires an analysis of what claims were compromised by the settlement agreement.

Under his contention that the entire transaction should be viewed as a sale by Marilyn and Robert of their claim against Bertha's estate, it was necessary for the I.R.S. conferee to construct a 1944 basis for the claim from which gain or loss could be computed. This proved to be extraordinarily difficult not only because of the lapse of time and the failure to administer Bertha's estate,[8] but also because of the large number of real estate parcels involved coupled with the fact that a number of changes in

---

**8.** A simple approach, of course, would have been to accept the determination of the California inheritance tax appraiser that Bertha's entire estate was comprised only of the Home Ranch and was worth only $122,000. Computing taxpayers' basis as one-ninth of that amount would result in a total basis of only

$13,555. Despite its simplicity, such an approach would have been manifestly unfair, for it ignores the myriad other serious claims made by Marilyn and Robert in their cross-complaint. Indeed, the I.R.S. conferee seems to have recognized the unfairness of any such approach.

the Orange County Tax Assessor's records over the years had rendered it virtually impossible to trace all Segerstrom parcels back to 1944.

During the course of negotiations, it was finally determined, with the assistance of a private tax research firm selected by tax-payers' then counsel, with the conferee's approval, that five parcels of land should be traced from 1944 to 1965. After comparing the value of these parcels of land and after additional negotiations, the conferee decided that, with respect to real estate in the vicinity of land allegedly owned wholly or partially by Bertha Segerstrom, approximately 25 percent of the land's 1965 value represented its value in 1944 and 75 percent represented appreciation in value between 1944 and 1965. Applying these percentages to the amounts received by Marilyn and Robert in settlement of the litigation, the Service finally determined that taxpayers' claim had a total value in 1944 of $90,404. Adding to this basis the $80,000 in attorney's fees incurred by taxpayers, a total basis of $170,404 was established, leaving the balance of $179,596 as a taxable long-term capital gain.

From the foregoing it is obvious that the Government views the settlement proceeds of $350,000 received by Marilyn and Robert as totally allocable to that portion of their cross-complaint which demanded a declaration of part ownership in the various Segerstrom real properties. In my opinion, however, such an allocation is erroneous since it ignores the other causes of action alleged in the cross-complaint which undoubtedly played a significant role in bringing about the eventual settlement.

It is clear that the Service conferee erred in failing to consider all causes of action alleged by Marilyn and Robert in their cross-complaint to which some portion of the settlement proceeds could have been allocated. The rule has been well stated by the Eighth Circuit Court of Appeals in *Carter's Estate v. Commissioner of Internal Revenue*, 298 F.2d 192 (8th Cir. 1962) where the court said at p. 194:

It is well-settled law that the classification for tax purposes of amounts received in settlement of litigation is to be determined by the nature and basis of action settled. [Citing cases.] If it is found that such a settlement is one in respect to a claim for lost profits or partly for lost profits and partly in lieu of punitive damages such as are recoverable in anti-trust litigation, there can be no question as to their taxability as ordinary income. [Citing cases.]

See, also, Rev.Rul. 58–418, 1958–2 C.B. 18 holding that amounts received in lieu of an award for punitive damages are taxable to the recipient as ordinary income. On the other hand, of course, under *Lyeth* and *Gavin, supra*, amounts received in lieu of corpus of an estate will be exempt from income tax. Cf. *Harte v. United States*, 252 F.2d 259 (2d Cir. 1958).

Because of uncertainties as to the assets comprising Bertha's estate, if any, because the state court never entered a judgment in the present case, and because the settlement agreement itself made no specific allocation of the proceeds, the court unfortunately is deprived of the usual guidelines for determining a reasonable allocation. Cf. *Tree v. United States*, 55 F.Supp. 438, 102 Ct.Cl. 128 (1944), *cert. den.* 324 U.S. 852, 65 S.Ct. 713, 89 L.Ed. 1412 (1945) where this court closely examined the terms of a more precise settlement agreement in applying the "in-lieu-of-what" test.

In the Fourth Cause of Action set forth in their cross-complaint, as amended, Marilyn and Robert alleged fraud and concealment on the part of their uncles, who were the surviving partners in the family partnership, and accordingly, they prayed for "punitive damages" in the sum of $10,000,-000. However, in the ensuing settlement agreement, Marilyn and Robert agreed that all such allegations of fraud, misrepresentation and concealment were untrue and without merit. In view of this concession, it would seem highly unrealistic to allocate any portion of the settlement proceeds to the tort demands for punitive damages, and they are, therefore, eliminated from consideration.

**50**

Elimination of those issues leaves for analysis the other causes of action asserted in the cross-complaint. Essentially they are reducible to demands for (1) a one-fifth ownership interest in the Home Ranch, (2) a one-forty-fifth ownership interest [9] in any real estate held by the family partnership, and (3) compensatory damages for loss of what the cross-complaint calls "the use, enjoyment, rents, issues, and profits" attributable to the complainant's interest in Bertha's estate and alleged to aggregate $5,000,000. Demand was made for an accounting of all of the partnership property and the profits therefrom since Bertha's death.

In determining a reasonable allocation of the settlement proceeds among these several causes of action, where the agreement itself does not do so, resort to the pleadings is proper and may be helpful. See, for example, *Raytheon Production Corp. v. Commissioner of Internal Revenue, supra; State Fish Corp.*, 48 T.C. 465, clarified at 49 T.C. 13 (1967); *Telefilm, Inc.*, 21 T.C. 688 (1954), reversed on another point 55-1 USTC ¶ 9453 (9th Cir. 1955); and Rev.Rul. 58-418, *supra*. Cf. *Tree v. United States, supra*. In the present case, the pleadings placed a monetary value only on the cause of action for lost profits, while the remaining demands sought only a declaration of part ownership in realty. However, at the trial of this tax dispute, evidence was produced which for allocation purposes sufficiently fixes the value of the Home Ranch and the partnership realty as of 1944, the year of Bertha's death.

For California inheritance tax purposes, the Home Ranch was estimated to be worth $122,000. The 2,000 acres of partnership realty were estimated to be worth no more than $1,000 per acre, or $2,000,000 for the entire 2,000 acres. Thus, if Marilyn and Robert had inherited their alleged shares of Bertha's estate in 1944, by intestate succession, they would have collectively received a one-ninth interest in the Home Ranch plus a ⅟₄₅ interest in the partnership, and at 1944 valuations, this would amount to a $13,555 interest in the Home Ranch and a $44,444 interest in the partnership realty. The $5,000,000 demanded for lost income from the partnership operations between 1944 and 1965 represents a 1965 evaluation, however, and cannot be simply added to the 1944 values without gravely distorting the base figure for allocation. The 1944 values should be adjusted and projected to 1965 by using the realty appreciation factor developed during the several conferences with I.R.S. conferees. This factor showed a mean growth of about 500 percent for all Segerstrom properties.

Thus, in terms of 1965 values, the taxpayers sought in the cross-complaint a $67,775 (500 percent of $13,555) interest in the Home Ranch, a $222,220 (500 percent of $44,444) interest in the partnership realty, and a $5,000,000 judgment for lost income. Hence, approximately $290,000 in real property interests and $5,000,000 in lost income were sought.

There are two choices for allocating at this point. First, the $350,000 settlement can be prorated according to the ratios that the real property interests and the income interest bear to the total amounts demanded; i. e., 290,000/5,290,000 (or 5.5 percent) of the settlement for land interests and 5,000,000/5,290,000 (or 94.5 percent) for the lost income. This method allocates almost all of the settlement to income and is unrealistic because it mixes plaintiffs' likely inflated and fictional demands for allegedly lost income with the actual real property values. The second and, under the circumstances here, more reasonable choice is to subtract the adjusted land values from the total settlement proceeds and treat the remainder as compensation for allegedly lost income. By this calculation, $290,000 of the settlement proceeds would have been received in lieu of the ownership interests asserted in the real property, and the remainder of $60,000 would be attributable to

---

9. The fraction of ⅟₄₅ was calculated as one-ninth of Bertha's one-fifth interest in the partnership.

the claimed compensatory damages for lost income.

Under such an allocation, taxpayers obviously would be liable for tax at ordinary income rates on the full $60,000, since that portion of the settlement was received in lieu of ordinary income and is therefore not excluded from income by Section 102, even as extended by *Lyeth*. See, *Harte v. United States, supra*, and *Raytheon Production Corp. v. Commissioner, supra*.

As to the proceeds received in lieu of the fractional ownership claims to realty, Section 102, as interpreted in *Lyeth*, allows that portion received by reason of heirship and thus akin to "inheritance" to be excluded from taxable income. Since the values of plaintiffs' 1944 inheritance, as computed above, were $13,555 for the Home Ranch and $44,444 for the partnership interest in realty, these amounts are excludible from gross income under Section 102.

However, the remaining $232,000 received in lieu of the claims to fractional ownership of real estate has not been shown by the taxpayers to be anything other than taxable income, after an adjustment, discussed below, for attorney's fees. It was, of course, open to them to show that this remainder was some sort of capital item such as unrecovered basis, or somehow otherwise not subject to income tax. They were unable to do so, however. All the evidence submitted can lead to no other conclusion but that this remaining amount was received in lieu of the rather spectacular appreciation of the properties over the 21-year period between the date of death and the date of settlement.[10]

The Government says that this realized appreciation was taxable as long-term capital gain. While for reasons previously stated, the Government's allocation procedure was faulty, I agree with its basic contention that the settlement here constituted a taxable event to be measured, *inter alia*, by the appreciation over the years. Accordingly, taxpayers are liable for long-term capital gains tax on $168,560, as computed in the schedule below.

Finally, there remains for consideration the I.R.S. allowance of taxpayers' attorney fees as an adjustment to the basis of their "claim". Section 1016(a) of the Code allows as an adjustment "expenditures . . . properly chargeable to capital account . . ." Here the attorney's fees, insofar as they were expended in the acquisition of property, are available for adjustments to basis. See, *Woodward v. Commissioner of Internal Revenue*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), and *Elrick v. Commissioner of Internal Revenue*, 158 U.S. App.D.C. 270, 485 F.2d 1049 (1973). Also, Section 212 allows as a deduction "all ordinary and necessary expenses paid or incurred . . . for the production or collection of income."

Here Marilyn and Robert expended $80,000 in attorney's fees to secure the settlement proceeds. As shown above, of the settlement proceeds, $60,000 was for lost income from the alleged partnership interest. A pro rata amount of the attorney's fees attributable to recovery of such income, or approximately $16,560, is therefore deductible under Section 212. Treas.Reg. § 1.212–1(k) (1965). The remainder of the attorney's fees, $63,440, is allowable as an

10. In tacit recognition of the fact that income was generated by this entire transaction, taxpayers suggest that, if so, such income was not taxable to them but either to Bertha's estate or to the cross-defendants. The theory seems to be that whatever the amount taxpayers received by the settlement, it was only their "inheritance" and therefore subject to the Section 102 exclusion from gross income without reference to the source of the proceeds. The difficulty with this argument is that in other cases where the taxpayer, as here, has received more in settlement than he would have received under a will or through intestacy, he must prove

that the excess was something other than income from the property which is the subject of the inheritance claim. See, for example, *E. C. Delmar*, 25 T.C. 1015 (1956). The argument also fails to take into account that if such excess is income upon which income tax should have been paid, the recipient heir may well be liable for such tax under the transferee provisions of Section 6901 of the Code. In the circumstances of this case, however, it is unnecessary to reach that question, particularly since the Segerstroms agreed in the settlement agreement to hold harmless Marilyn and Robert for any possible transferee liability.

adjustment to basis under Section 1016, since it was expended in the acquisition of money attributable to the real estate ownership interests (which, as previously discussed, included the attendant appreciation). *Cf.* Rev.Rul. 58–418, *supra* (amount of settlement not includible in income reduces proportionately the amount of attorney's fees deductible under Section 212).

In summary, the taxpayers have been required by the Service to include in gross income $179,596[11] on which they paid income taxes at long-term capital gain rates. However, the record here shows that as a result of the settlement the taxpayers should have reported net income of $212,000 of which $43,440 (in lieu of lost income) was taxable as ordinary income and $168,560 was taxable as long-term capital gain.[12]

The following schedule shows the results of the foregoing allocation in tabular form:

| | | |
|---|---|---|
| Total Amount Received Under Settlement | | $350,000 |
| Less Adjusted Basis: | | |
| Amount received as "inheritance" | $58,000 | |
| Portion of attorney's fees attributed to basis | 63,440 | |
| Less amount attributed to lost income and taxable as ordinary income | 60,000 | 181,440 |
| Amount taxable as long-term capital gain | | $168,560 |
| Amount Taxable as Ordinary Income | 60,000 | |
| Less portion of attorney's fees attributed to lost income | 16,560 | 43,440 |
| Total of taxable settlement proceeds after above adjustments | | $212,000 |

From this table it is at once apparent that far from showing an overpayment of their 1965 income taxes, the taxpayers have actually underpaid their taxes for that year.[13] Nearly 45 years ago, the United States Supreme Court in its decision in *Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932), instructed us that in tax refund cases:

11. $350,000 settlement proceeds less $170,404 comprised of $90,404 basis and $80,000 attorney's fees.

12. To arrive at the amount reportable by each taxpayer, of course, these figures would simply be divided by two.

. . . An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.

Accordingly, plaintiffs are not entitled to the refunds claimed, and their petition must be dismissed.

### CONCLUSION OF LAW

Upon the trial judge's findings and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed.

13. Apparently satisfied with the amount of taxes previously collected, however, the Government has not counterclaimed for any additional tax.