563 S.E.2d 810

Joseph TANKOVITS, III, Plaintiff Below, Appellee,

v.

Lee J. GLESSNER, Defendant Below, Appellant,

Imogene G. Tankovits, etc.; WesBanco Bank Wheeling, etc.; Windmill Truckers Center, Inc.; Suder; Windmill Lounge, Inc.; Wheeling Coin Machine Company; Glessner Enterprises, Inc.; and Tankovits Enterprises, Inc., etc.; "John Doe", etc.; Martin J. Ragan, etc.; Defendants Below, Appellees.

and

Joseph Tankovits, III, John Tankovits, Denise Clayton and Le Ann Harris, Plaintiffs Below, Appellants,

v.

Lee J. Glessner, Imogene G. Tankovits, etc.; WesBanco Bank Wheeling, etc.; Windmill Truckers Center, Inc.; Suder; Windmill Lounge, Inc.; Wheeling Coin Machine Company; Glessner Enterprises, Inc.; and Tankovits Enterprises, Inc., etc.; "John Doe," etc.; Martin J. Ragan, etc.; Defendants Below, Appellees.

No. 30028, 30029.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 6, 2002.

Decided April 5, 2002.

Paul J. Harris, Wheeling, for Joseph Tankovits, III, John Tankovits, Denise Clayton, and Le Ann Harris.

Charles O. Lorensen, George & Lorensen, P.L.L.C., Charleston, James T. McClure, Gompers, McCarthy & McClure, Wheeling, for Lee J. Glessner and Windmill Truckers Center, Inc.

Jolyon W. McCamic, McCamic & McCamic, Wheeling, for Gary Glessner.

ALBRIGHT, Justice.

Through this consolidated action, the parties to this appeal seek to reverse two separate orders of the Circuit Court of Ohio, both of which were entered on October 3, 2000, that pertain to a settlement agreement arising from allegations of improper funding and management of a trust. Upon a full review of the arguments in conjunction with the record submitted to this Court, we conclude that the circuit court committed error with regard to each of its orders dated October 3, 2000, and accordingly, we reverse and remand.

## I. Factual and Procedural Background

The primary parties to this appeal are either the children or grandchildren of Lee S. Glessner ("Lee S."), who died testate on September 4, 1984. Ten years before his death, Lee S. set up an inter vivos trust under which Lee J. Glessner ("Lee J."), the son of Lee S.; Imogene G. Tankovits ("Imogene"), the daughter of Lee S.; and WesBanco Bank Wheeling ("WesBanco"), were named as trustees. Under the will, Lee J. and Imogene were named as executor and executrix. Pursuant to the will's pour-over clause, the residuary assets of the estate were to be the bulk of the inter vivos trust corpus. The primary residual asset intended to pour over into the trust was 1,089 shares of stock in Windmill Trucker's Center ("Windmill"), the family business. The residuary beneficiaries of the trust were the grandchildren of Lee S.[1]

After discovering that certain breaches of fiduciary duty may have taken place, the four surviving children of Imogene[2] (hereinafter referred to as "Plaintiffs") filed a lawsuit in 1996 against the trustees, WesBanco, Windmill, and various CPA defendants through

---

1. Those grandchildren included the four surviving children of Imogene: Joseph Tankovits, III; John Tankovits; Denise Clayton; and Le Ann Harris, as well as the one child of Lee J., Gary Glessner.

2. See supra note 1.

which they alleged breach of fiduciary care; intentional interference with testamentary bequest; conversion; fraud; and negligence. Despite requests from the fiduciary commissioner, no fiduciary accountings relative to the estate of Lee S. were filed until sometime in 1995.[3] Once the accountings were filed, the Plaintiffs discovered that the executors had been operating a de facto trust out of estate assets that had not been brought under the supervision and control of WesBanco,[4] as the designated corporate trustee. At the center of the alleged defalcations, was a stock redemption scheme[5] under which all 1,089 shares of stock held by Lee S. at the time of his death, valued at $3,002,646 for estate tax purposes, were sold by the estate to Windmill. Upon his father's death, Lee J. had assumed the presidency and operation of Windmill.

As the result of a settlement conference held on July 22, 1999, an agreement was reached and the terms of settlement were placed upon the record. Under the settlement agreement, Lee J., Imogene, and Windmill agreed to pay the Plaintiffs $2,500,000 through a combination of both cash and real property. In exchange for this payment, the Plaintiffs agreed to transfer to Gary Glessner, the son of Lee. J., their one-half interest in certain real estate "underlying the Dallas Pike BP/Dairy Queen property."[6] The Plaintiffs received an additional $900,000 as the result of payments from other settling defendants.[7] The settlement agreement expressly provided that the $900,000 would be paid to the estate prior to distribution to the Plaintiffs. Similarly, the $2,500,000 in property and cash owed to the Plaintiffs from the trustees and Windmill was required to be paid to the estate before it was distributed to the Plaintiffs "as partial distribution of their inheritance."

When problems arose with regard to the settlement agreement, the Plaintiffs filed two separate motions to enforce the agreement.[8] On December 11, 1999, the trial court heard the motions to enforce and ruled, by order dated December 15, 1999, that all the cash payments required under the settlement agreement were to be deposited into the appropriate accounts[9] and in turn, paid out to the Plaintiffs "as a partial distribution of Plaintiffs' inheritance." The lower court further ordered that the Plaintiffs were to receive the total cash settlement owed to them on December 15, 1999. That amount—$2,879,736—included the $900,000 in settlement proceeds paid by Nationwide, WesBanco, and the CPA Defendants,[10] as well as the

3. This only resulted when the fiduciary commissioner ordered the estate to file annual accountings for the past ten years.

4. In 1991, and apparently for the first time, WesBanco wrote to Lee J. and stated that it "was still waiting to receive the residual of his estate."

5. The scheme, according to the Plaintiffs, resulted in the estate being short-changed by the sale of its primary asset back to Windmill at an artificially low price. According to the Plaintiffs, the CPA defendants masterminded this stock reduction plan in order to provide Lee J. with a financial mechanism under which his holdings in Windmill were enhanced from a 31% stake pre-redemption to a 71% stake post-redemption. Under the buyout plan, Windmill purchased the stock at a price much less than its market value and had ten years in which to repay the purchase price with no interest. Although Windmill and the CPA defendants took the position below that the stock retirement was necessary to generate funds needed to pay off the federal estate tax obligation, the Plaintiffs maintain that the amount for which the stock was retired "was far in excess of" the tax liability.

6. The BP/Dairy Queen are owned by Windmill, and the Plaintiffs do not claim any interest in those business entities.

7. WesBanco paid $500,000; Nationwide, as the insurer of Windmill, paid $250,000; and the CPA Defendants paid $150,000.

8. The record submitted to this Court contains only the second of these motions, which was filed on October 14, 1999.

9. Apparently, the first motion to enforce the agreement was filed after the "Trustee attempted to make the payments required under the settlement agreement by simply providing [the] Plaintiffs with a cashier's check, rather than passing all settlement sums through a trust account," but as the trial court noted in its order of October 3, 2000, "this was disallowed by Order of Court entered on December 15, 1999, without objection."

10. Following the tender of the $900,000 to the estate, the CPA Defendants, WesBanco, and third-party defendant William Ihlenfeld, counsel for the estate, were dismissed from the underlying action.

$1,979,736 cash differential that the Plaintiffs were owed under the $2,500,000 portion of the settlement.[11] While the trial court recognized the existence of additional issues in need of resolution in its order of December 15, 1999, including the "tax issue," it deferred decision on these issues pending receipt of additional briefs.

In one of two orders entered on October 3, 2000, the trial court addressed the "tax issue," which involved the question of whether the settlement amounts were taxable to the Plaintiffs under the terms of the settlement agreement. Reasoning that the $2,500,000 in cash and property from the trustees and Windmill "was paid to the Plaintiffs as a partial distribution of their inheritance," the trial court ruled that this "sum is not to be treated as gross income for state and federal tax purposes and the Trust is prohibited from taking a deduction on such payments." With regard to the $900,000 paid by Wes-Banco, Nationwide, and the CPA Defendants, the lower court characterized the same as "compensatory damages" and directed that those funds "must be treated as such for tax purposes." [12]

■ In a separate order entered on October 3, 2000, the trial court ruled upon an issue concerning the Plaintiffs' execution of a deed necessary to transfer their interest in the real property "underlying the Dallas Pike BP/Dairy Queen property." The Plaintiffs contend that only after the settlement agreement was reached did they learn that their ownership interest in the subject property might include improvements to the property and not just the land itself. In drafting a deed to effectuate the property transfer, the Plaintiffs' counsel inserted language that would reserve and except any other interest that they might own in the property, other than the land underlying the subject business entity.[13] Gary Glessner, the grantee, refused to accept this deed and the trial court was asked to resolve whether the reservation/exception clause could be inserted into the deed. Rejecting the Plaintiffs' argument of "mutual mistake" regarding the extent of the ownership interests in the subject property,[14] the trial court ordered the Plaintiffs to execute the deed prepared by counsel for Gary Glessner [15]—the deed that did not include a reservation or exception clause.

Through this consolidated appeal, Lee J. seeks to have this Court rule that the trial court committed error when ruling on the "tax issue" by prohibiting the trust from treating the $2,500,000 settlement amount paid to the Plaintiffs as a distribution of income and in ruling that the terms of the settlement agreement indicate that the Plaintiffs were to incur no tax liability in connection with their receipt of these settlement funds. The Plaintiffs seek a ruling from this Court permitting them to convey their interest in the property underlying the BP/DQ property expressly subject to reservation and/or exception of any other interest they may have in improvements made to the property while it was under lease to Windmill. The Plaintiffs also seek a ruling from this Court that the lower court erred in concluding that the $900,000 in settlement funds

11. The cash differential was arrived at by deducting from $2,500,000 the value of certain properties that were transferred to the Plaintiffs by the trustees and Windmill under the settlement agreement.

12. By characterizing the $900,000 as compensatory in nature, the Plaintiffs suggest that the trial court wrongly prevented those funds from being properly viewed as replacement funds for moneys that should have been initially transferred from the estate to the trust. When viewed in this light, the Plaintiffs argue that the $900,000 settlement, like the $2,500,000 settlement, was a distribution of their inheritance and, accordingly, is exempt from gross income under federal tax law. See 26 U.S.C. § 102(a) (1996).

13. See infra note 27.

14. Under the doctrine of mutual mistake, a contract is reformable or voidable if it can be shown that the parties were both mistaken about a basic fact which is material to the agreement. See McGinnis v. Cayton, 173 W.Va. 102, 105, 312 S.E.2d 765, 769 (1984). The Plaintiffs raised the issue of mutual mistake when Gary Glessner took the position post settlement that, by agreeing to transfer their interest in the real estate "underlying" the BP/Dairy Queen property, the Plaintiffs had in fact agreed to sell "all of their right, title, and interest" to such property.

15. Gary Glessner owned a one-half interest in the property and the Plaintiffs owned the other one-half interest.

paid by WesBanco, Nationwide, and the CPA Defendants was compensatory in nature and, thus, not exempt from characterization as gross income under federal tax laws.[16]

## II. Standard of Review

■ As we explained in syllabus point two of *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997),

In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Applying this mixed standard of review to the case at bar requires that we review the lower court's ruling that the Plaintiffs were to incur no tax liability in connection with their receipt of the $2,500,000 settlement amount and its directive to the Plaintiffs to execute a deed that lacked a reservation/exception clause under an abuse of discretion standard. Our review of the lower court's characterization of the $900,000 in settlement funds as compensatory in nature is limited to recognizing the fact that federal tax law is solely determinative of that issue of characterization. *See Lyeth v. Hoey*, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119 (1938) (holding that federal law determines whether funds received pursuant to settlement were acquired by inheritance). Similarly, we review the trial court's directive to the trust regarding deductions for the $2,500,000 settlement amount for the limited purpose of acknowledging the circuit court's lack of jurisdiction regarding matters of federal tax law. *See Reed v. Elly*, 1989 WL 73014 at *3 (Ohio App.1989) (stating that "[i]t is a well-established principle that the trial court did not have subject matter jurisdiction over the issue of federal taxes").

## III. Discussion

### A. Tax Issue

■ The dispute regarding the taxability of the $2,500,000 settlement amount centers on language included in the settlement agreement that provides as follows:

The parties agree and intend that the payments and transfers made to the Plaintiffs under Paragraphs 1, 2 and 4, shall be made at full value as indicated above and that no tax, administrative fees or other expenses shall be deducted by the estate, Trust or any other party. Further, it is the intent of all parties that any such tax, expense, et cetera, shall not be borne by Plaintiffs.

This clause, according to the Plaintiffs, unmistakably states that they were not to incur any tax liability with regard to their receipt of the $2,500,000 settlement funds. Conversely, Lee J. and Windmill maintain that this language only addresses the Plaintiffs' receipt of the $2,500,000 without deducting any amounts for taxes or expenses that the estate or trust incurred in connection with its receipt of the funds and property used to aggregate the settlement amount.

In trying to ascertain the parties' intent with regard to this language, the circuit court looked to the language that appears earlier in the agreement which identifies the trust's payment of the $2,500,000 to the Plaintiffs "as a partial distribution of their inheritance." Based upon the inheritance nature of the $2,500,000 settlement payment, the trial court then reasoned that the final sentence in the clause of the agreement under discussion, which provides that "any such tax, expense, etc. shall not be borne by Plaintiffs," had to mean that "no taxes were to be paid on said sum." This reasoning, however, does not withstand scrutiny.

Given the ambiguity surrounding the meaning of the terms "any such tax" in the last sentence of the clause, we find it necessary to apply the construction principles of *ejusdem generis* and *noscitur a sociis*. We recently explained these concepts in *Murray v. State Farm Fire and Casualty Co.*, 203 W.Va. 477, 509 S.E.2d 1(1998):

---

**16.** *See* 26 U.S.C. § 104(a)(2) (1996) (excepting compensation received for personal physical in-

jury from definition of "gross income").

Under the doctrine of *ejusdem generis,* "[w]here general words are used in a contract after specific terms, the general words will be limited in their meaning or restricted to things of like kind and nature with those specified." Syllabus Point 4, *Jones v. Island Creek Coal Co.,* 79 W.Va. 532, 91 S.E. 391 (1917). The phrase *noscitur a sociis* literally means "it is known from its associates," and the doctrine implies that the meaning of a general word is or may be known from the meaning of accompanying specific words. *See* Syllabus Point 4, *Wolfe v. Forbes,* 159 W.Va. 34, 217 S.E.2d 899 (1975). The doctrines are similar in nature, and their application holds that in an ambiguous phrase mixing general words with specific words, the general words are not construed broadly but are restricted to a sense analogous to the specific words.

203 W.Va. at 485, 509 S.E.2d at 9.

Applying these principles of construction to the language at issue suggests that the second appearance of the word tax—"any such tax ... shall not be borne by Plaintiffs"—is not a reference to income taxes in the general sense, but instead reference to the specific type of tax mentioned in the previous sentence—a tax incurred on the corpus of the estate or trust. This conclusion is buttressed by the use of the same terms in the second sentence of the clause that are grouped together in the first sentence where tax deductions "by the estate, Trust or any other party" are initially proscribed. By including "expense, et cetera" immediately after "any such tax," the last sentence appears to parallel the language of the first sentence and its prohibition of deductions for "tax, administrative fees or other expenses" by the estate or trust.

The lower court's exclusive reliance on language indicating that the $2,500,000 settlement amount was a "partial inheritance" to determine the taxation issue suggests that the trial court or the settling parties may not have fully appreciated the existence and importance of two separate classes of taxable events underlying the issue.[17] The first class of taxable events potentially generated a federal gift or estate tax liability, by reason of the transfer of property or moneys, either to the trust during Lee S.'s lifetime,[18] or by reason of the transfer of property and moneys to the estate incident to the death of Lee S. and the probate of his will. A second class of taxable events occurred whenever income was realized by the estate or trust, either through earnings received on the corpus of the estate or trust, or due to profits from the sale of assets. In the case of gift taxes, either the donor (Lee S.) or the donee (the trust) is liable for the tax; in the case of estate taxes, the estate and its fiduciaries are primarily liable for such tax.[19] With respect to the income taxes assessable on income as profits or earnings, the tax may be paid by the estate; or, if that income and profit is distributed to the beneficiaries of the estate, the estate may deduct the distribution, leaving the tax to be paid by the beneficiaries. Regardless of whether the tax issue involves the first or second class of taxable event discussed above, the federal tax code controls who is liable for the tax and what exemptions and deductions are allowed. *See generally* 26 U.S.C. §§ 641–692 (1988).

The language at issue which addresses the non-payment by the Plaintiffs of "any tax" appears to be in reference to the first class of taxable event—taxes incurred by the estate or trust upon the receipt of the corpus. In this Court's opinion, the agreement under

---

**17.** We reach this conclusion based on the fact that the trial court relied solely on the language indicating that the $2,500,000 was to be a "partial distribution" of the Plaintiffs' inheritance to determine whether this portion of the settlement was taxable to the Plaintiffs. Lee J. correctly argues that the partial inheritance finding relied upon by the trial court has no bearing on whether the trust is allowed or disallowed from taking an income distribution deduction under 26 U.S.C. § 661. Under federal law, any distribution made by the trust would be treated as gross income under 26 U.S.C. § 662 unless the Plain-

tiffs were entitled to exempt the distribution from income under the provisions of 26 U.S.C. § 102(b).

**18.** From the record, it appears that little or no property was actually transferred to the trust during Lee S.'s lifetime.

**19.** The beneficiaries of the trust may be held liable secondarily in the event the estate or its fiduciaries fail to timely remit such tax payments.

consideration simply does not address the tax effects associated with the second class of taxable events—which occurs when the estate or trust realizes earnings and distributes the same.[20] Based on our conclusion that the language proscribing any deductions for taxes or expenses by the estate or trust from the $2,500,000 settlement amount only addresses the Plaintiffs' entitlement to *receive* the full $2,500,000 without deductions for costs or taxes that the estate or trust might incur relative to the receipt of property used to accumulate the settlement funds, we find the lower court erred in concluding that the terms of the agreement provided that the Plaintiffs were to incur no tax liability upon their receipt of these funds. Whenever the beneficiaries of an estate or trust, here the Plaintiffs, received a distribution, either from the corpus of the estate or trust or received income earned on the corpus or its sale, the federal tax code controls the type of deduction the trust or estate is entitled to make on its tax return and also, whether the distributions thereof qualify as gross income on the Plaintiffs' personal income tax returns. *See* 26 U.S.C. §§ 102, 661, 662 (1988).

■■■ On the related matter of the trial court's belated directive [21] to the trust concerning the non-issuance of Schedule K–1's relative to the $2,500,000 settlement payment,[22] we conclude that the lower court had no authority to require the trust to file, or not to file, any particular type of tax form or return. It is beyond discussion that a circuit court is without authority to address issues of federal tax law. *See Hartwick College v. United States,* 588 F.Supp. 926, 930

(N.D.N.Y.1984), *aff'd,* 801 F.2d 608 (2nd Cir. 1986) (stating that "Congress has created an elaborate and exclusive scheme for judicial review of federal income tax liability, assigning distinct roles in that scheme to the United States District Courts and the United States Tax Courts[;]" and further recognizing that "a question of income tax liability *may only be determined conclusively by the federal court invested with the authority to determine it directly* ") (emphasis supplied, in part). With the issuance of the *Lyeth* decision in 1938, it was established that the issue of whether settlement amounts paid to heirs in compromise of an inheritance claim fall within the exclusion from gross income provided for the value of property acquired by gift, bequest, devise, or inheritance is a federal question that is controlled by federal tax law. *See Lyeth,* 305 U.S. at 193, 59 S.Ct. 155; *Parker v. United States,* 215 Ct.Cl. 773, 573 F.2d 42, 46–47 n. 6 (1978) (recognizing as "settled" the notion that federal law necessarily controls issues involving whether settlement moneys qualify as inheritance under federal tax system "in order to give uniformity to the application of the [Internal Revenue] Code"); *see also* 26 U.S.C. § 102 (1996) (exempting gifts and inheritance from gross income but including income from gifts, inheritance, devises or bequeathals under federal tax system).

■■■ Issues regarding the tax effects of settlement payments paid to heirs, which necessarily involve identification of both the source and characterization of the funds,[23] are clearly beyond the power of the circuit court given the exclusive federal jurisdiction

**20.** Lee J. notes in his brief that it would have been a factual impossibility for the estate or the trust to agree to pay the personal income taxes associated with the Plaintiffs' receipt of the $2,500,000, as neither the trust nor the estate had any available source of funds from which to pay such income taxes at the time of the settlement on July 22, 1999.

**21.** In April 2000, the trust had issued Fiduciary Form 1041 Schedule K–1 tax forms to the Plaintiffs for filing with the Internal Revenue Service on which each of the four Plaintiffs was listed as receiving income in the amount of $850,000.

**22.** While the language used by the trial court in its order was to "prohibit[ ] [the Trust] from taking a deduction on such payments," applica-

tion of this language to tax law filing requirements is the equivalent of a ruling that directs, albeit belatedly, the trust not to issue Schedule K–1's in connection with the trust's filing of its Fiduciary Form 1041.

**23.** As the Plaintiffs explained in their petition for appeal, "if the money and property transferred by the trust to petitioners is treated as principal, the same would not be included as gross income under IRC § 102(a) and no taxes would be borne by the Plaintiffs with respect to such payments. If, however, such inheritance is one of income, it is not excludable from gross income."

over matters of federal taxation. *See Parker*, 573 F.2d at 46–47. As a consequence of this federal jurisdiction, a circuit court is without power to direct a taxpayer to disregard federal income tax laws and regulations. Accordingly, the lower court committed error by indirectly instructing the trust not to file certain tax documents relative to the settlement payments.[24]

## B. Deed Issue

■ The Plaintiffs challenge the lower court's decision to require them to execute a deed that fails to include language they view as necessary to protect their possible interest in improvements made to the subject real estate. No one disputes that the Plaintiffs did not learn until after the settlement agreement was reached that they may have an interest in more than just the real estate at issue "underlying the Dallas Pike BP/Dairy Queen property."[25] In explanation of the choice of language used in the agreement to describe their prospective conveyance, the Plaintiffs state in their petition that "underlying" was chosen to make clear that they were not conveying any interest in the BP and Dairy Queen business establishments that are situated on the property, an interest which they acknowledge they do not have.[26]

In seeking approval for the insertion of the reservation/exception clause language,[27] the Plaintiffs argue that if they execute a deed that omits this language they will be forever waiving their right to resolve any possible ownership interest they may have to improvements on the subject real estate. In making this argument, they cite the provisions of West Virginia Code § 36–3–10 (1923) (Repl.Vol.1997), under which a statutory inference of full transference of all ownership interests arises if you deed a parcel of property without reference to any additional interest. This provision states that "[e]very deed conveying land shall, unless an exception be made therein, be construed to include all buildings, privileges, and appurtenances of every kind belonging to the lands therein embraced." W.Va.Code § 36–3–10.

Given the need to expressly reserve their possible interest in the improvements to the real estate under the provisions of West Virginia Code § 36–3–10, and given the unresolved nature of the Plaintiffs' interest in the improvements, we determine that the lower court committed error by directing the Plaintiffs to execute a deed conveying their one-half ownership in the subject property without the requested reservation or exception clause.[28] The agreement reached between the parties regarding the conveyance of the Plaintiffs' interest in the land *underlying* the subject property is entitled to be enforced. Nothing in that agreement, however, indicates that the Plaintiffs intended to transfer any interest they owned in any improvements made to the property.[29] Since the terms of the agreement only required the Plaintiffs to convey their interest in the land "underlying" the BP and Dairy Queen establishments, the bargain reached between the parties does not extend to and include transference of any possible ownership interest the Plaintiffs might have in improvements to the subject real estate.

24. *See supra* note 22.

25. After examining certain deeds and leases, the Plaintiffs learned that they might also have an interest in improvements placed on the real estate while the property was under lease to Windmill.

26. *See supra* note 15. The Plaintiffs only seek to reserve and except a possible interest in any building, appurtenances, etc. that were constructed on the real estate while the land was under lease to Windmill. The BP and Dairy Queen establishments were constructed on the land in 1980, a year before the real estate was first leased to Windmill.

27. The language included in the draft deed prepared by the Plaintiffs' counsel states: "EXCEPTING AND RESERVING, HOWEVER, any interest of the Grantors [the Plaintiffs] other than their interest 'in the real property underlying the Dallas Pike BP/Dairy Queen property,' said Exceptions and Reservations comprising their interest in any and all buildings, improvements, appurtenances and the like presently existing on the subject property."

28. *See supra* note 27.

29. Our decision today implies neither that the Plaintiffs have or do not have an interest in the buildings and appurtenances upon which the reservation language may operate.

Based upon the Plaintiffs' late discovery of potential ownership interest in the improvements to the subject property and the effects of failing to reserve and except that potential interest under West Virginia Code § 36–3–10, it would be patently unfair for this Court to deny the Plaintiffs the right to reserve the opportunity to later resolve whether they have any interest in the improvements made to the property while it was under lease to Windmill.[30] While the record suggests that title to the land and to some of the improvements situated on the property was severed, the record does not fully inform us as to the terms and conditions of any prior lease to the subject property.[31]

By allowing the Plaintiffs to include the reservation and exception clause set forth in their draft deed, we are not adjudicating any issue regarding the possible ownership interests that the Plaintiffs seek to reserve. We are merely providing the Plaintiffs with an opportunity to prove the existence of an ownership interest at a future point in time. Upon remand, the lower court is directed to permit the parties to execute a deed to the property underlying the BP/DQ property that includes the exception/reservation clause that the Plaintiffs have proposed to the trial court.[32]

### C. Characterization of $900,000

■ The Plaintiffs disagree with the lower court's characterization of the $900,000 in settlement funds from WesBanco, Nationwide, and the CPA Defendants as compensatory in nature. Since those funds were paid to replace moneys that should have been placed in the trust initially under the pour-over clause of the will, they argue that those funds, like the $2,500,000 settlement, should be characterized as inheritance in nature.

It is well-established that the federal income tax consequences to heirs as a result of payments made pursuant to a settlement agreement present questions of federal law that are to be solely adjudicated by the federal courts. The United States Supreme Court announced in *Lyeth:*

> [W]hen the contestant is an heir and a valid compromise agreement has been made and there is a distribution to the heir from the decedent's estate accordingly, the question whether what the heir has thus received has been "acquired by inheritance" within the meaning of the federal statute necessarily is a federal question. *It is not determined by local characterization.*

305 U.S. at 193, 59 S.Ct. 155 (emphasis supplied); *cf. Parker,* 573 F.2d at 46 (recognizing that "state law determines who are the heirs, the validity of the will, and the procedure for probate and compromise").

As the United States Supreme Court recognized in *Lyeth,* the characterization by a state court of funds will not determine the federal tax consequences of those moneys. 305 U.S. at 193, 59 S.Ct. 155. Under state law, we have no basis from which to conclude whether the lower court was in error in deciding that the $900,000 in settlement funds was "compensatory" in nature. With regard to the issue of characterizing these funds for purposes of federal tax law,[33] however, neither the trial court nor this Court has jurisdiction to address this issue. The trial court's characterization of these funds is not binding; this issue must be addressed and resolved by the federal tax authorities.

Given the exclusive nature of federal law regarding this taxation issue, we hold only that the lower court was without authority to attempt to determine the tax consequences of the $900,000 in settlement funds. Since we similarly lack authority to resolve this issue

---

**30.** *See supra* note 26.

**31.** The only lease included in the record covers the years 1981–1984. Beyond that, we have no other documentation with regard to the property interests at issue.

**32.** *See supra* note 27.

**33.** We note that characterization of the funds as "compensatory" does not reach the ultimate issue of whether those funds are taxable. That determination must be made by applying 26 U.S.C. § 102, which excludes from gross income inheritance amounts provided such amounts are not income on inheritance principal, and 26 U.S.C. § 104, which determines whether amounts received as damages for injuries are excluded from gross income.

of federal taxation, we decline to further address this issue.

Based on the foregoing, we reverse the October 3, 2000, ruling of the Circuit Court of Ohio County which determined that, under the terms of the settlement agreement, the $2,500,000 settlement payment was not gross income to the Plaintiffs, and directed the trust not to issue any tax documents listing the $2,500,000 settlement payment as an income deduction to the trust. With regard to the separate October 3, 2000, order of the Circuit Court of Ohio County, we reverse the lower court's directive to the Plaintiffs to execute a deed without a reservation or exception clause relative to any interest they may be able to establish in improvements made to the subject real estate and remand this matter to the lower court for entry of an order permitting the Plaintiffs to execute a deed to the subject property underlying the BP/DQ that includes the proposed reservation/exception clause. As to the characterization by the Circuit Court of Ohio County in the October 3, 2000, "tax order" regarding the $900,000 settlement payment, we find that the lower court was without jurisdiction to rule on the characterization of such funds and we expressly decline to address this issue due to the exclusive jurisdiction of the federal courts in this area of federal taxation.

Reversed and remanded.