JUDITH TIPPS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8401–77, 8402–77, 7348–78, 7349–78.     Filed May 28, 1980.

*Charles J. Faruki* and *Armistead W. Gilliam, Jr.,* for the petitioners.

*Rudolph L. Jansen,* for the respondent.

CHABOT, *Judge:* Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6653(b)[2] (fraud) as follows:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax sec. 6653(b) |
|---|---|---|---|---|
| 8401–77 | Judith Tipps...... | 1973 | $90,529.92 | $47,310.96 |
| 8402–77 | Charles Paul Tipps, Jr ......... | 1973 | 90,529.92 | 47,310.96 |

---

[1]Cases of the following petitioners are consolidated herewith: Charles Paul Tipps, Jr., docket Nos. 8402–77, 7348–78; and Judith Tipps, docket No. 7349–78.

[2]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.

| 7348–78 | Charles Paul Tipps, Jr | 1970 | $16,623.18 | $8,311.59 |
|---------|------------------------|------|------------|-----------|
|         |                        | 1971 | 37,748.42  | 32,530.21 |
|         |                        | 1972 | 40,906.00  | 20,453.00 |
| 7349–78 | Judith Tipps           | 1970 | 16,623.18  | 8,311.59  |
|         |                        | 1971 | 37,748.42  | 32,530.21 |
|         |                        | 1972 | 40,906.00  | 20,453.00 |

Petitioners claim overpayments as follows:

| Docket No. | Petitioner | Year | Overpayment |
|------------|-----------|------|-------------|
| 8401–77 | Judith Tipps | 1973 | $4,092.00 |
| 8402–77 | Charles Paul Tipps, Jr | 1973 | 4,092.00 |
| 7348–78 | Charles Paul Tipps, Jr | 1971 | 15,356.74 |
|         |                        | 1972 | 18,966.70 |
| 7349–78 | Judith Tipps | 1971 | 15,356.74 |
|         |              | 1972 | 18,966.70 |

The cases have been consolidated for trial, briefs, and opinion.

After concessions and agreements by the parties, the only issue remaining for decision is whether certain partnerships of which the petitioner-husband was a partner validly elected (or continued valid elections for) the benefits of the accelerated depreciation method provided by section 167(k) for 1973 and 1974.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petitions in these cases were filed, petitioners resided in Ohio.

Sometime during the late 1960's, petitioner Charles Paul Tipps, Jr. (hereinafter sometimes referred to as Tipps), became involved in the rehabilitation of multifamily low-income rental housing as an individual, as a general partner, as a limited partner, and as a corporate officer. Most of the housing projects in which he was involved were section 236 projects. A section 236 project is a federally assisted low and moderate income multi-family rental housing project insured under section 236 of the

---

[3]Respondent has conceded the fraud issue in all the dockets. As a result of the settlement of other issues, the parties agree that there are no deficiencies for 1970, 1971, and 1972. Respondent has conceded that, under sec. 6013(e), petitioner Judith Tipps is not liable for any deficiency that may be redetermined for 1973. The parties also have settled all other issues.

National Housing Act and administered by the Federal Housing Authority. The determination of a taxpayer's eligibility for section 236 assistance is made by the U.S. Department of Housing and Urban Development.

During the period 1970 through 1976, Tipps participated in the profits and losses of 14 limited partnerships as either a limited partner or a general partner. These partnerships are listed in table I.

TABLE I

| Partnership name | Percentage of ownership by Tipps | Partnership name | Percentage of ownership by Tipps |
|---|---|---|---|
| Anthony Arms Apartments | 0.5 | Savoy-Hoosier Associates | 1.0 |
| Apollo Associates | 1.0 | St. Ledger Apartments | 0.5 |
| Carpenter's Associates* | 4.5 | Paul Tipps Enterprises No. 1** | 50.0 |
| Holden House Apartments | 0.5 | Paul Tipps Enterprises No. 2** | 50.0 |
| Jackson Place Associates | 1.0 | Paul Tipps Enterprises No. 3** | 25.666 |
| Blacherne Associates | 1.5 | Urban Properties No. 2** | 25.666 |
| Richelieu-Argyle Associates | 1.0 | Van Gold Enterprises** | 10.0 |

*Original year of election issue.
**Subsequent year of election issue.

For 1973 and 1974, the six limited partnerships indicated by asterisks in table I (hereinafter sometimes collectively referred to as the partnerships) deducted depreciation of expenditures to rehabilitate low-income rental housing under the straight-line method using a useful life of 60 months and no salvage value, pursuant to section 167(k).[4]

Tipps was the general partner of Carpenter's Associates, Urban Properties No. 2, Paul Tipps Enterprises No. 2, and Paul Tipps Enterprises No. 3. The partnership agreements of Carpenter's Associates, Urban Properties No. 2, and Paul Tipps Enterprises No. 3, each contained provisions to the following effect:

---

[4] The parties agree that our determination as to the original year of election (sec. 1.167(k)–4(b)(1)(vii), Income Tax Regs.) and the subsequent year of election (sec. 1.167(k)–4(b)(2)(ii), Income Tax Regs.) for the partnerships will control as to all the partnerships listed in table I. The parties also agree that it will control as to the following partnerships in which Tipps did not participate in the profits or losses: Somerset Associates, St. Clair Associates, West Side Associates, Academy Associates, Avondale Associates, D.A.C. Associates, Fenway-Hale Associates, Plymouth Associates, and Poinciana Associates.

(1) With certain restrictions, the general partner was given complete control over the conduct of partnership affairs, including the authority to hire accountants.

(2) The general partner warranted compliance with all valid regulations promulgated by the Secretary of the Treasury pursuant to section 167(k) in order that all the dwelling units in the project would qualify as low-income rental housing and in order that the rehabilitation expenditures with respect to the project would qualify for rapid depreciation authorized by section 167(k).

(3) The partnership was to elect, in accordance with applicable law and regulations, to compute the depreciation deduction attributable to rehabilitation expenditures incurred with respect to the project by the method permitted by section 167(k).

Valid initial or subsequent year elections pursuant to section 167(k) and section 1.167(k)–4, Income Tax Regs., were made (a) in the 1970 Federal partnership income return of Van Gold Enterprises; (b) in the respective 1971 Federal partnership income returns of Paul Tipps Enterprises No. 1, Paul Tipps Enterprises No. 2, and Van Gold Enterprises; and (c) in the respective 1972 Federal partnership income returns of Urban Properties No. 2, Paul Tipps Enterprises No. 1, Paul Tipps Enterprises No. 2, Paul Tipps Enterprises No. 3, and Van Gold Enterprises. These returns were signed by Tipps on behalf of the partnerships (except for the 1970 Van Gold Enterprises return), prepared by the accounting firm of Alexander Grant & Co. (hereinafter sometimes referred to as Alexander Grant), and contained all the per-unit information required by sections 1.167(k)–4(b)(1)(vii) and 1.167(k)–4(b)(2)(ii), Income Tax Regs., to constitute valid initial or subsequent year elections.

Subsidized Management, Inc., was incorporated in Ohio on July 15, 1971, and engaged in the management of rental housing units, including units owned by partnerships in which Tipps or Property Management Consultants, Inc. (a corporation in which Tipps had an ownership interest), was a general partner, and a number of subsidized housing units owned by nonprofit organizations. In 1971, Property Management Consultants, Inc., was acquired by and became a subsidiary of Subsidized Management, Inc. The name of Subsidized Management, Inc., was changed to Federal Property Management Corp. (hereinafter referred to as Management).

Earl Bennett (hereinafter referred to as Bennett) was hired in late September or early October 1973 by Management as manager of taxes and investor relations. He continued in that position until mid-October of 1976. As tax manager, Bennett was responsible for the preparation of all Federal partnership income, Federal corporate income, State income, local property, and payroll tax returns. In 1973 and 1974, Bennett was required to prepare about 35 to 50 Federal income tax returns.

Bennett prepared the 1973 and 1974 Federal partnership income returns for the partnerships. The change from (a) having Alexander Grant prepare the partnership income returns to (b) having Bennett prepare the partnership income returns with Alexander Grant checking and signing them, was part of an effort to reduce Management's audit bill.

In connection with the preparation of these returns, and, in particular, in order to determine how to comply with section 167(k) and the applicable regulations, Bennett referred to the partnerships' prior years' income returns and sought Alexander Grant's advice. Bennett asked Alexander Grant what could be done to satisfy the law and still file the returns on time in view of the fact that the numbers of housing units managed by Management had increased and the reporting requirements had become more difficult to meet. Alexander Grant's manager in charge of Management's account wrote Bennett a letter dated October 18, 1973, to familiarize Bennett with the requirements of section 167(k). Enclosed with the letter were: (1) A detailed description of section 167(k) and the information required for initial and subsequent year elections; (2) a form of the schedule to be filed for the initial election which included space for per-unit information of expenditures allocated; and for occupied units, the period, number of occupants, maximum income permitted, adjusted income, method of deriving adjusted income, and rent charged; and for vacant units, the period, number of rooms, income level, and stated rent; (3) a form of the schedule to be filed for subsequent years which contained space for per-unit information including the unit number, number of bedrooms, number of occupants, adjusted income, and maximum income permitted; and (4) a copy of an audit schedule used to generate information for these schedules. The letter also stated as follows:

After reviewing the above information it will be apparent that compliance with the code is a very difficult task. In anticipation of the coming year end, I contacted our Washington, D.C. office who arranged for me to speak with a Mr. Oyler, who is with IRS and works with the code section in question. I received two responses from this individual as follows:

I. He was well aware of the extensive filing requirements of Section 167K and stated that although he could not waive the requirements, if he had to file the returns he would probably attach a statement to the returns that "the information requested by Sec. 167K is available in our office for field audit."

II. He stated that in certain cases the owners of rehabilitation projects have leased the entire building to a municipality who in turn leased to the public. This action resulted in only one tenant. He did not know the detailed procedures but suggested that the procedure is available at the following address:

Housing Authority of the City of Los Angeles
2445 West Whittier
Montebello, California 90640
Telephone (213) 726-1144

I have outlined two potential solutions to the problem. I believe you should explore the possibilities of number II and consider the risks of number I and then meet with me to discuss the alternatives.

Very truly yours,

ALEXANDER GRANT & COMPANY

Some of the records needed for the per-unit information required by the regulations were maintained by Management at the sites of the partnerships' projects in Indianapolis, Ind; Cincinnati, Ohio; and Dayton, Ohio. Thus, at the time of the preparation of the partnerships' Federal income returns, these records were not in Bennett's possession. These records included the information on period of occupancy, number of occupants, maximum income permitted, adjusted income, method of determining adjusted income, rent charged, period vacant, number of bedrooms vacant, income level of vacant units, and stated rent of vacant units. Other per-unit information, including the unit number and the expenditures allocated to each unit, was maintained at Management's headquarters in Dayton, Ohio.

After receiving this letter, Bennett discussed the matter with Alexander Grant. Bennett also followed up on suggestion II outlined in the letter by sending two letters to the Los Angeles Housing Authority. Bennett received no response to these letters. After conducting more research, Bennett concluded that suggestion II was not a suitable solution for the limited

partnerships with which he was concerned. Instead, the partnerships' 1973 and 1974 Federal income returns were prepared using the forms provided by Alexander Grant with the exception that the statement, "Per unit information requested by Sec. 167K. is available in our office for field audit," was inserted in lieu of the per-unit information, in accordance with suggestion I in the letter from Alexander Grant. This statement was used both for the initial elections (sec. 1.167(k)–4(b)(1)(vii), Income Tax Regs.) and for the subsequent years (sec. 1.167(k)–4(b)(2)(ii), Income Tax Regs.). The partnerships' 1973 Federal income returns, as prepared by Bennett, were reviewed and signed by Alexander Grant as tax return preparer. Tipps signed all the 1973 and 1974 returns of the partnerships. The only information omitted from the partnerships' 1973 and 1974 Federal income returns that was required by the regulations under section 167(k) was the per-unit information listed in sections 1.167(k)–4(b)(1)(vii) and 1.167(k)–4(b)(2)(ii), Income Tax Regs.

Each of the partnerships' 1973 and 1974 Federal income returns, in providing the required information (except for the per-unit information), included either the statement "Pursuant to Regulation 1.167(k)–4, the following information is submitted for the purpose of electing to compute depreciation of rehabilitation expenditures by the straight-line method over a 60-month period," (for initial elections) or "Statement Required by Sec. 167(k) for Years Subsequent to Year of Election" (for subsequent years).

The partnerships' 1975 and 1976 Federal income returns were signed by Tipps (with the exception of the 1976 return of Van Gold Enterprises), and all of these returns (including the 1976 return of Van Gold Enterprises) contained all the information required by the regulations.

Allan Gradsky (hereinafter referred to as Gradsky), a certified public accountant, became involved in petitioners' Federal income tax matters and the partnerships' Federal income returns in 1974. The Internal Revenue Service first informed the partnerships on December 19, 1975, that section 167(k) would be an audit issue. Three days later, Gradsky offered to either (a) provide the Internal Revenue Service agent, Lowell White (hereinafter referred to as White), access to the files containing the per-unit information or (b) schedule the per-unit information for White. White responded that he did not know whether that

was acceptable. White was given access to the files that contained the per-unit information. Gradsky then instructed Bennett to get the per-unit information together and schedule it for the Internal Revenue Service. Bennett then obtained the information from the tenant files at the projects or at the central rental offices at the projects. The preparation of the requested schedules took approximately 3 months, with 8 to 12 people involved in the preparation. The schedules were completed by early spring of 1976 and given by Bennett to Gradsky. When the schedules were completed, Gradsky offered them to White, but White again indicated he did not know if he could accept them. White never did accept the schedules nor did he ever give Gradsky a reason for not accepting them.

Sometime before September 24, 1976, the accounting firm of Coopers & Lybrand (hereinafter referred to as Coopers) became Management's accountants. This firm also advised the partnerships. Gradsky met with Coopers' personnel to discuss the concerns of Coopers and of Management regarding the appropriateness of continuing to depreciate on a 5-year basis in view of the Internal Revenue Service's position that the section 167(k) elections were not operative. By letter dated September 24, 1976, Coopers advised Bennett that the information submitted with the 1973 Carpenter's Associates return substantially complied with the Treasury regulations.

Finally, Gradsky filed the information for 1973 and 1974, together with a cover letter dated July 1, 1977, with John King, the Internal Revenue Service appellate appeals officer in the case.

## OPINION

Respondent asserts that petitioners are not entitled to the benefit of accelerated depreciation provided by section 167(k) since the elections for such treatment were invalid or revoked because the information filed with the partnerships' Federal income returns did not satisfy the requirements of section 1.167(k)–1(a) and paragraphs (a) and (b) of section 1.167(k)–4, Income Tax Regs. Petitioners assert that the elections were valid and that they are entitled to accelerated depreciation under section 167(k). We agree with petitioners.

Section 167(k)[5] provides that taxpayers[6] may elect to depreciate over 60 months their expenditures to rehabilitate low-income housing. Such an election is to be made "in accordance with regulations prescribed by the Secretary" (sec. 167(k)(1)).

The regulations provide rules for the manner of making the election.[7]

---

[5]SEC. 167. DEPRECIATION.

(k) DEPRECIATION OF EXPENDITURES TO REHABILITATE LOW-INCOME RENTAL HOUSING.—

(1) 60-MONTH RULE.—The taxpayer may elect, in accordance with regulations prescribed by the Secretary or his delegate, to compute the depreciation deduction provided by subsection (a) attributable to rehabilitation expenditures incurred with respect to low-income rental housing after July 24, 1969, and before January 1, 1975, under the straight line method using a useful life of 60 months and no salvage value. Such method shall be in lieu of any other method of computing the depreciation deduction under subsection (a), and in lieu of any deduction for amortization, for such expenditures.

(2) LIMITATIONS.—

(A) The aggregate amount of rehabilitation expenditures paid or incurred by the taxpayer with respect to any dwelling unit in any low-income rental housing which may be taken into account under paragraph (1) shall not exceed $15,000.

(B) Rehabilitation expenditures paid or incurred by the taxpayer in any taxable year with respect to any dwelling unit in any low-income rental housing shall be taken into account under paragraph (1) only if over a period of two consecutive years, including the taxable year, the aggregate amount of such expenditures exceeds $3,000.

(3) DEFINITIONS.—For purposes of this subsection—

(A) REHABILITATION EXPENDITURES.—The term "rehabilitation expenditures" means amounts chargeable to capital account and incurred for property or additions or improvements to property (or related facilities) with a useful life of 5 years or more, in connection with the rehabilitation of an existing building for low-income rental housing; but such term does not include the cost of acquisition of such building or any interest therein.

(B) LOW-INCOME RENTAL HOUSING.—The term "low-income rental housing" means any building the dwelling units in which are held for occupancy on a rental basis by families and individuals of low or moderate income, as determined by the Secretary or his delegate in a manner consistent with the policies of the Housing and Urban Development Act of 1968 pursuant to regulations prescribed under this subsection.

(C) DWELLING UNIT.—The term "dwelling unit" means a house or an apartment used to provide living accommodations in a building or structure, but does not include a unit in a hotel, motel, inn, or other establishment more than one-half of the units in which are used on a transient basis.

Sec. 167(k) was amended by sec. 3(c) of the so-called "pins and needles" Act, Pub. L. 93–625, 88 Stat. 2109; secs. 203(a) and 1906 (a)(14)(A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1530, 1834; sec. 4(a) of Pub. L. 95–171, 91 Stat. 1355; and sec. 367 of the Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2857. The amendments, which served essentially to postpone the expiration of the provision, have no effect on the instant cases.

[6]For this purpose, "taxpayers" includes partnerships. Sec. 1.167(k)–1(c), Income Tax Regs.

[7]Sec. 1.167(k), Income Tax Regs., provides, in pertinent part, as follows:

Sec. 1.167(k)–1 Depreciation of property attributable to rehabilitation expenditures.

(a) In general. (1) In the case of property attributable to rehabilitation expenditures incurred with respect to low-income rental housing after July 24, 1969, and before January 1, 1975, a taxpayer may elect under section 167(k) to compute the depreciation deduction provided by section 167(a) by using the straight line method, a useful life of 60 months, and no salvage

The parties have no dispute as to whether the partnerships satisfied the requirements of subdivisions (i), (ii), (iii), (iv), (v), (vi), (viii), (ix), and (x) of section 1.167(k)–4(b)(1) and subdivision

---

value, in lieu of any other method of computing the reasonable allowance referred to in section 167(a). The expenditures must meet the conditions and limitations contained in secs. 1.167(k)–2 and 1.167(k)–3 and the election must be made as prescribed in sec. 1.167(k)–4. * * *

Sec. 1.167(k)–4 Time and manner of making election.

(a) *Manner of election*—(1) *In general.* An election under section 167(k) shall be made by attaching a statement to the income tax return filed for the first taxable year in which the taxpayer computes the depreciation deduction using a 60-month useful life. An information statement shall be attached to the income tax return filed for each subsequent taxable year in which the taxpayer computes depreciation under section 167(k). * * *

(b) *Information required*—(1) *Election year.* The election to compute depreciation under section 167(k) with respect to any property must contain the following information:

(i) Taxpayer's name, address, and identification number.

(ii) Description of property with respect to which an election is made, and the date such property was placed in service (see sec. 1.167(k)–1(b)(3)).

(iii) Location and description of building being rehabilitated.

(iv) Number of dwelling units in the structure, and the number of such units occupied on a transient basis (see sec. 1.167(k)–3(c)(2)).

(v) Date rehabilitation expenditures were incurred (see sec. 1.167(k)–1(a)(2)).

(vi) Statement that all income certifications required by sec. 1.167(k)–3(b)(4) have been obtained.

(vii) For each dwelling unit which the taxpayer seeks to qualify as low-income housing for purposes of the election under section 167(k):

(*a*) Rehabilitation expenditures allocated to such unit (see sec. 1.167(k)–2(d)), (*b*) For each period of occupancy during the taxable year, the number of occupants, the maximum income level permissible under sec. 1.167(k)–3(b)(2) for that number of occupants, the adjusted income of the occupants of such unit (determined solely from the income certifications required by sec. 1.167(k)–3(b)(4)), the method by which such income was determined, and the rent charged for such unit, and

(*c*) For each period in which such unit is vacant during the taxable year, a description of each such unit (as to number of rooms), the low- or moderate-income level in that area for the number of persons occupying comparable units, and the rental at which each vacant unit is offered.

(viii) If allocation is required under sec. 1.167(k)–2(d), the area occupied by dwelling units and nondwelling units.

(ix) If applicable, statement of intent to fulfill $3,000 minimum amount limitation (see sec. 1.167(k)–4(a)(2)).

(x) If the taxpayer is treated as having paid or incurred expenditures by reason of sec. 1.167(k)–1(b), the amount of such expenditures, the date the expenditures were incurred, the date the property attributable to the expenditures was placed in service, the method of accounting used by the person that made the expenditures, and the purchase price for the property attributable to the expenditures.

(2) *Subsequent years.* For each taxable year in which depreciation is computed under section 167(k) after the taxable year of the election, the statement required by this section must state the rental charges for each occupied unit and the rental charge at which each vacant unit is offered. In addition, if any such unit is rented to a new tenant during the taxable year, such statement must also contain the following information:

(i) A statement that such tenant has signed an income certification (sec. 1.167(k)–3(b)(4)), and

(ii) The number of occupants in the unit, the maximum income level permissible under sec. 1.167(k)–3(b)(2) for that number of occupants, and the total adjusted income of such occupants,

(i) of section 1.167(k)–4(b)(2), Income Tax Regs. The parties also agree that the only information provided with the partnerships' Federal income returns as to sections 1.167(k)–4(b)(1)(vii) and 1.167(k)–4(b)(2)(ii) was the statement, "Per unit information requested by Sec. 167K. is available in our office for field audit."

Regulatory requirements that relate to the substance or essence of the statute must be complied with strictly. *Penn-Dixie Steel Corp. v. Commissioner*, 69 T.C. 837, 846 (1978); *Dunavant v. Commissioner*, 63 T.C. 316 (1974); *Valdes v. Commissioner*, 60 T.C. 910 (1973). See cases discussed in *Taylor v. Commissioner*, 67 T.C. 1071, 1079–1080 (1977). However, substantial compliance may be sufficient if the regulatory requirements in dispute are procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly and prompt conduct of business, and if the omission of the required material has not operated to respondent's prejudice. *Taylor v. Commissioner, supra; Hewlett-Packard Co. v. Commissioner*, 67 T.C. 736 (1977); *Columbia Iron & Metal Co. v. Commissioner*, 61 T.C. 5 (1973), and cases cited therein.

It is essential to establish that an election has been made, so that the partnerships (and their members) are bound. (See *Hewlett-Packard Co. v. Commissioner, supra; Dunavant v. Commissioner, supra; Dougherty v. Commissioner*, 61 T.C. 719 (1974).) It is essential to establish what the election is to apply to, so that the partnerships (and their members) are bound. (See *Valdes v. Commissioner, supra.*) The record in the instant cases appears to clearly establish that the partnerships were making and continuing section 167(k) elections that bound them, and clearly identify the properties and expenditures as to which the elections were being made. We do not understand respondent to contend otherwise. The statute itself does not set forth further requirements as to the election. Even if the per-unit information had been filed exactly as respondent desired, respondent would not have had any additional information identifying or describing the property to which the elections applied or specifying that the elections were being made. Respondent does not contend that giving effect to the claimed elections in the circumstances

determined solely from the income certifications required by sec. 1.167(k)–3(b)(4).

Sec. 1.167(k)–1(a)(1) was amended by T.D. 7642, 1979–43 I.R.B. 8 (filed Aug. 22, 1979), to substitute "January 1, 1982," for "January 1, 1975."

of this case will result in petitioners obtaining any unwarranted advantages by reason of a greater range of hindsight than would have been available if the required information had been supplied on the partnerships' returns. Nor does respondent appear to have been hindered in any way by the omissions. See *Dougherty v. Commissioner*, 60 T.C. 917, 941 (1973).

In *Columbia Iron & Metal Co. v. Commissioner, supra,* a corporation that reported income in accordance with the accrual method of accounting, made charitable contributions within 2½ months after the close of its 1969 taxable year. The statute there involved (sec. 170(a)(2)[8] ) permitted the corporation to elect to deduct the contributions on its 1969 return, even though the gifts were made in January and February 1970. Respondent's regulations dealing with the section 170(a)(2) election required that there be attached to the 1969 Federal income return (1) a copy of the corporation's board of directors resolution authorizing the contributions and (2) the verified, written declaration of an officer of the corporation that the resolution was adopted during 1969. On the return, each of the contributions in question was described as "Accrued at December 31, 1969." A copy of the corporate minutes was given to respondent's agent during the course of an examination of the corporation's 1969 return. The officer's written declaration was served on the respondent after a conference with the Court to discuss settlement. We held that the corporation had substantially complied with the statute and the regulations.

In *Columbia Iron,* as in the instant cases, the statute authorized respondent to issue "legislative" regulations as to the

---

[8]SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

* * * * * * *

(2) CORPORATIONS ON ACCRUAL BASIS.—In the case of a corporation reporting its taxable income on the accrual basis, if—

(A) the board of directors authorizes a charitable contribution during any taxable year, and

(B) payment of such contribution is made after the close of such taxable year and on or before the 15th day of the third month following the close of such taxable year,

then the taxpayer may elect to treat such contribution as paid during such taxable year. *The election may be made only at the time of the filing of the return for such taxable year, and shall be signified in such manner as the Secretary or his delegate shall by regulations prescribe.* [Emphasis supplied.]

The subsequent amendment of this provision by sec. 1906(a)(14)(A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1834, had no effect on the *Columbia Iron* case.

election. (See *Hewlett-Packard Co. v. Commissioner*, 67 T.C. at 748-749.) In the instant cases, the returns were much clearer than in *Columbia Iron* in alerting respondent to the making of an election and also to the omission of the required material. In the instant cases, the returns included a great portion of the required explanation and substantiation of the claimed deductions, far more than was included in the return in *Columbia Iron*. In *Columbia Iron*, as in the instant cases, the omitted material was supplied to respondent after the commencement of examinations of the returns. In the instant cases, the omitted material was first offered to respondent well before the issuance of the notice of deficiency, while in *Columbia Iron* the last item was not provided until after the Court had consulted with the parties. In the instant cases, preparation of the required material was far more burdensome than in *Columbia Iron*. In the instant cases, as in *Columbia Iron*, all the substantive requirements for the claimed deduction were met. In each case, to the extent that the favorable tax treatment was given by the Congress in exchange for actions the Congress sought to encourage, the taxpayers had done the things the Congress sought to encourage. Respondent has not suggested that the partnerships' failure to include the required information on their returns has operated to his prejudice in any particular, and we find no such prejudice. On the basis of *Columbia Iron & Metal Co. v. Commissioner, supra,* we conclude that the partnerships in the instant cases have substantially complied with the statute and the regulations, and that petitioners are entitled to their deductions under section 167(k).

In *Dunavant v. Commissioner, supra,* we noted that the statute there involved (sec. 333(d)) specifically required the individual shareholder to file an actual election within 30 days after the date of the adoption of the corporation's plan of liquidation. Also, the desired status of "qualified electing shareholder" could be attained by an individual only if proper elections were filed by owners of stock possessing at least 80 percent of the corporation's voting power. We held that the providing of information was not sufficient. We concluded that—

Clearly the "essence" of the statute is to demand specific, contemporaneous, and incontrovertible evidence of a binding election to accept the tax consequences imposed by the section. We are not at liberty to infer that an election

existed when the unequivocal proof required by Congress does not exist. [63 T.C. at 320.]

In the instant cases, in contrast, we are satisfied that the partnerships timely provided "incontrovertable evidence of a binding election to accept the tax consequences imposed by" section 167(k).

Similarly, in *Valdes v. Commissioner, supra,* we concluded that the statement filed by the petitioner therein was ambiguous in that it could have been interpreted to be intended to apply to section 165(i) for 1974, rather than to be an election under section 172(b)(3)(C)(iii) with direct impact on many other years. Also, the statement in *Valdes* was not clearly an election, an "unequivocal agreement" (60 T.C. at 914) to be bound. In the instant cases, in contrast, there does not appear to be uncertainty as to what was elected, and we are satisfied that the election was an unequivocal agreement to be bound by the rules of section 167(k).

Respondent contends that the elections are not valid because the requirements of the regulations which were not met went to the substance of the election and were not merely procedural. Respondent contends that we should not apply the doctrine of substantial compliance in the instant cases because: (1) Petitioners were aware of the regulations' requirements but voluntarily failed to comply; (2) the information required by the regulations is necessary to police the use of the section and thereby insure that the congressional purpose of providing favorable tax treatment for the rehabilitation of low-income rental housing is achieved; (3) the per-unit information serves the purpose of identifying the property with respect to which the election is made and allows respondent to have the material on hand for audit purposes; (4) "the data provide a useful checklist to the taxpayers to determine which units qualify for the section 167(k) treatment"; (5) the Internal Revenue Service uses the information for classifying tax returns for audit purposes in an orderly and efficient manner, and so the information assists the Internal Revenue Service in carrying out its function of administering the tax laws; and (6) the requirement of attaching the per-unit information increases the accuracy and truthfulness of the return.

On brief, respondent summarizes his position as follows: "Administrative chaos would result from circumstances where

taxpayers are permitted to choose which provisions of what regulations they desire to satisfy."

The question before us is not whether to sustain or invalidate the regulation. *Columbia Iron & Metal Co. v. Commissioner*, 61 T.C. at 8. Rather, the question is the much more limited one of whether, in the circumstances presented in the instant cases, the partnerships should be treated as never having made a valid election (or as having revoked previous valid elections) because of their failure to comply literally with the requirements of the regulation. As indicated above, we have held elections valid in a number of cases even though the elections did not comply strictly with the applicable regulations. Respondent has not shown, or even suggested, any specific instances of administrative chaos that has flowed from those opinions. Nor has he suggested what chaos would flow from the opinion herein.

As to the first argument, we conclude that, in this context (as distinguished from a dispute over the addition to tax under section 6653(a), for example), the partnerships made reasonable efforts to comply literally with the regulations; they furnished most of the required information with their income returns, they alerted the Internal Revenue Service promptly as to the omissions, and they made their files available and presented the Service with the omitted information as soon as the Service indicated the necessity thereof.

As to the second argument, we agree with both sides' assertions that the Congress displayed great concern for low-income rental housing when section 167(k) was enacted as part of the Tax Reform Act of 1969 (Pub. L. 91–172). In this act, the Congress was trying to remove competitive tax disadvantages for investments in rental housing and create competitive advantages for such investments. By repealing the investment credit (sec. 703 of the Act, 83 Stat. 660), the Congress removed an incentive for construction funds to shun buildings generally and housing in particular. Housing was given a competitive construction fund tax advantage by the enactment of section 167(j) (sec. 521(a) of the Act, 83 Stat. 649) and revision of section 1250 (sec. 521(b) of the Act, 83 Stat. 652). And section 167(k) (sec. 521(a) of the Act, 83 Stat. 651) focused the Congress' especial concern with tax advantages for rehabilitation of low-income rental housing. H. Rept. 91–413 (Part 1), pp. 165–167, 179 (1969), 1969–3 C.B. 200, 303–304, 311–312; S. Rept. 91–552, pp. 211–215,

224 (1969), 1969–3 C.B. 423, 557–559, 565. See General Explanation of the Tax Reform Act of 1969, Staff of the Joint Committee on Internal Revenue Taxation, pp. 181–183.[9] The Congress created a new tax shelter for low-income rental housing. This was not a replacement for the repealed investment credit (as was section 169), but rather a fresh, intended tax inducement. The inducement was a limited one. It is not for us (or for respondent, qua litigant) to question the wisdom or efficacy of the inducement in general. The parties agree that the parternships did indeed do what the Congress wanted to be done. Under these circumstances, we conclude that our examination of the legislative history does not strengthen respondent's position but rather leads us to accept petitioners' view of the situation— the substantial compliance by the partnerships is sufficient; their initial elections and subsequent years elections are valid.

As to the third argument, we agree that identification of the properties is essential for a valid election. However, the material submitted by the partnerships with their income returns appears to sufficiently identify the properties and respondent has not suggested any particular in which that identification was lacking an element that would have been supplied by the omitted per-unit information.

The remainder of the third argument, and the fifth argument, go to the reasonableness of the regulations but do not show their essential nature in terms of the validity-of-election issue we face in the instant cases. *Taylor v. Commissioner, supra.* Requirements that exist merely to aid in the processing and auditing of returns are in our view procedural or directory.

The fourth argument would have us invalidate the partnerships' elections because the partnerships failed to provide themselves with a checklist for their own use. We do not consider this a weighty argument.

The sixth argument we find troubling. Respondent argues that the effectiveness of the potential criminal penalties under section 7206(1) which act as a deterrent to the making of false statements on tax returns is decreased when taxpayers are

---

[9]Also see S. Rept. 93–1357, p. 1 (1974), 1975–1 C.B. 517; H. Rept. 94–658, p. 182 (1975), 1976–3 C.B. (Vol. 2) 695, 874; S. Rept. 94–938, p. 44 (1976), 1976–3 C.B. (Vol. 3) 49, 82; H. Rept. 95–1445, p. 100 (1978), 1978–3 C.B. (Vol. 1) 181, 274; S. Rept. 95–1263, p. 188 (1978), 1978–3 C.B. (Vol. 1) 315, 486.

permitted to omit information required by the regulations. To adopt this reasoning would be tantamount to requiring strict compliance with all regulations regardless of whether the regulations are directory or mandatory. Respondent apparently has not yet reconciled himself to the concept of substantial compliance. See *Dougherty v. Commissioner*, 61 T.C. at 721. Besides, this perceived purpose of the regulation primarily concerns a desire to facilitate the auditing and processing of the returns by encouraging their veracity; it does not concern an essential requirement of the statutory election. In addition, there is no evidence in the instant cases that a motive for omitting the information might have been to avoid making false statements. Finally, in circumstances where there was a willful omission of information, there are other sanctions available to the Government. See sec. 7203.

On answering brief, respondent asserts for the first time that the instant cases are controlled by *Penn-Dixie Steel Corp. v. Commissioner, supra*. We do not agree. *Penn-Dixie Steel Corp.* concerned an attempted election for the 60-month amortization of pollution control facilities under section 169. Section 1.169–4(a)(1)(ix), Income Tax Regs., required, as part of the election, a statement that the facilities were certified by the Federal certifying authority or a statement that application for certification had been made. The taxpayer failed to file such a statement. No application for certification had been made at the time of making the election in the original tax return. Later, when the facilities were certified, an amended tax return was filed. This Court, holding that the requirement for the statement went to the essence of the statute and so was mandatory, explained (69 T.C. at 846–847) as follows:

While the actual filing of a copy of the required certification or application therefor may be a procedural detail, *the implicit requirement that such an application must have been made* goes to the very essence of the statute.

The essential prerequisite to rapid amortization under section 169 is that the taxpayer's pollution control facility must be certified. Although a literal reading of the statute might require a taxpayer to obtain certification as a prerequisite to the election under section 169, respondent's regulations, perhaps in recognition of the practical difficulties presented by such a reading, require only proof that application for certification has been made. The *underlying requirement that such an application, in fact, be made* before the return is filed relates to the essential qualification for election under section 169 and cannot be dismissed as a mere procedural detail. [Emphasis supplied.]

In contrast to *Penn-Dixie Steel Corp.*, all the essential prerequisites to rapid depreciation under section 167(k) were met in the instant cases. All the substantive underlying acts which were a necessary precondition to the ability to comply with the regulations were accomplished; only the supporting information or evidence of compliance was not filed with the initial and subsequent years elections. This is precisely the point on which we distinguished *Columbia Iron* in *Penn-Dixie Steel Corp. v. Commissioner*, 69 T.C. at 847.

We hold that under the circumstances of the instant cases, there has been substantial compliance with sections 1.167(k)–4(a) and 1.167(k)–4(b), Income Tax Regs. Since we have held that there was substantial compliance with the regulations, we need not decide whether a failure to substantially comply would constitute a revocation of an otherwise valid election, under section 1.167(k)–4(d), Income Tax Regs.

———

Since the parties have stated a desire that these cases serve as precedent for the decision of other cases (see n. 4 *supra*), it may be appropriate to point out that a number of issues are not being decided in this opinion. For example, as noted above, we are not invalidating the regulations drawn in question. We do not decide what role these regulations may serve in other cases with regard to possible additions to tax under, for example, subsections (a) or (b) of section 6653 where there may be underpayments. We do not decide whether there would have been substantial compliance if the returns had not clearly alerted respondent to the omission of certain information or if the partnerships had not supplied the omitted information.

To reflect the concessions made by the parties and the conclusion reached herein,

*Decisions will be entered under Rule 155.*