The CREDIT LIFE INSURANCE
COMPANY, Plaintiff–
Appellee,

v.

The UNITED STATES, Defendant–
Appellant.

No. 91–5028.

United States Court of Appeals,
Federal Circuit.

Oct. 31, 1991.

Peter H. Winslow, Scribner, Hall & Thompson, Washington, D.C., argued for plaintiff-appellee. With him on the brief was E.P. Baker, of counsel.

Robert W. Metzler, Attorney, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With him on the brief were Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and David I. Pincus.

Before NEWMAN, MICHEL, and PLAGER, Circuit Judges.

MICHEL, Circuit Judge.

The government appeals the United States Claims Court's grant of summary judgment in favor of The Credit Life Insurance Company ("Credit Life" or "taxpayer") in its suit for a partial refund of income taxes paid. *Credit Life Ins. Co. v. United States*, No. 585–84T (Cl.Ct. Oct. 17, 1990). The Claims Court erred in concluding that in claiming a bad debt deduction, taxpayer was entitled to rely on the conclusive presumption of worthlessness in the pertinent Treasury Regulation, 26 C.F.R. § 1.166–2(d)(1) (1973), despite not meeting the conditions set forth in the regulation. We therefore reverse and remand.

## BACKGROUND

In 1978 Credit Life entered into a reinsurance agreement with Uniworld Insurance Company, Ltd. and its affiliates (collectively "Uniworld") in which Credit Life agreed to underwrite credit life and credit accident and health insurance business generated by agents secured by Uniworld. Uniworld was to collect premiums and remit them less their authorized commissions to Credit Life, and then through a series of reinsurance agreements, to assume the entire risk for that insurance. From the be-

ginning of the arrangement, Uniworld was frequently late in reporting sales and remitting premiums. In December 1980, Uniworld informed Credit Life that it would default on 35 percent of its obligations under the reinsurance agreement, and Credit Life believed Uniworld to be insolvent. Credit Life then terminated 35 percent of the reinsurance[1] and demanded payment of an approximately $5.8 million receivable due on the terminated reinsurance.

In a letter dated March 9, 1981, the Ohio Department of Insurance advised Credit Life that it should charge off the Uniworld receivable from its 1980 Annual Statement, either as a reduction of premium income or as a bad debt expense.[2] Credit Life accordingly eliminated $5.8 million from its income on its annual statement. Similarly, on its 1980 federal income tax return, Credit Life did not include the receivable in income and claim a bad debt deduction, but rather, simply excluded it altogether from the gross income reported.

In an audit of the 1980 return completed in 1988, the Internal Revenue Service ("IRS" or "Service") determined that Credit Life should have accrued the Uniworld receivable into income. The government then claimed an offset in the Claims Court litigation involving Credit Life's tax liability for 1973–77, arguing that the income accrual in 1980 eliminated an operations loss that otherwise could be carried back to 1977 and 1978.

Both parties moved for summary judgment. Credit Life contended that the Service's adjustment on audit was improper because it was entitled to rely on a conclusive presumption of worthlessness for bad debts in 26 C.F.R. § 1.166–2(d)(1). The Service argued that the regulation did not apply to this situation because, *inter alia*, it only applies to debts claimed as a deduction on the return when filed, and Credit Life did not include the receivable in income and then claim a bad debt deduction,

but simply excluded it from income altogether.

In an oral bench ruling, the Claims Court held that Credit Life was entitled to rely on the regulation despite the requirement of claiming the deduction at the time of filing the return: "[F]or reasons stated by the Plaintiff in those papers I think it is in spite of the surface language about when the return is first filed, that the state of the law is such that they are nonetheless entitled to take that deduction with respect to tax year 1980." Transcript of July 19, 1990 Proceedings (Joint Appendix at 83). The court held that under the regulation's conclusive presumption of worthlessness, the taxpayer was entitled to the deduction and accordingly granted summary judgment in favor of Credit Life. The parties stipulated to partial dismissal of the complaint as to issues not already decided and as to the amount of tax and interest taxpayer would be entitled to recover under the Claims Court's order. The court then entered a final judgment on October 17, 1990.

The United States appeals the grant of summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (1988).

## DISCUSSION

### I

■ Treasury Regulation § 1.166–2(d) provides a conclusive presumption of worthlessness for certain bad debts which regulatory agencies require be charged off:

If a bank or other corporation which is subject to supervision by Federal authorities, or by State authorities maintaining substantially equivalent standards, charges off a debt in whole or in part, either—

(i) In obedience to the specific orders of such authorities, or

(ii) In accordance with established policies of such authorities, ...

---

1. Credit Life was protected from potential liability by letters of credit on the other 65 percent of the reinsured risks.

2. Life insurance companies doing business in Ohio are required to file annual statements of profits and losses. Ohio Rev.Code Ann. § 3911.02.

then the debt shall, to the extent charged off during the taxable year, be conclusively presumed to have become worthless, or worthless only in part, as the case may be, during such taxable year. 26 C.F.R. § 1.166–2(d)(1) (1973). But the regulation expressly precludes application of the presumption in cases in which the taxpayer did not claim a bad debt deduction on the return itself:

> But no such debt shall be so conclusively presumed to be worthless, or worthless only in part, as the case may be, if the amount so charged off is not *claimed as a deduction by the taxpayer at the time of filing the return* for the taxable year in which the charge-off takes place.

*Id.* (emphasis added).

By its terms, then, the regulation cannot apply to a debt, like the Uniworld receivable, which was not "claimed as a deduction by the taxpayer," but simply was excluded from income. Additionally, the second part of the requirement—to claim the deduction "at the time of filing the return"—precludes doing so later. Credit Life, however, argued that it had no choice but to exclude the receivable from income since it believed Uniworld was insolvent and hence the receivable was uncollectible and not properly accruable in 1980 under the all-events test of 26 C.F.R. § 1.451–1(a)

(1978). Since the cited regulation is inapplicable, taxpayer's argument is unavailing. Whether the receivable was collectible is a wholly separate question from the events which gave rise to the accrual of this income. Taxpayer's further reliance on Revenue Rule 81–18, 1981–1 Cum.Bull. 295, even assuming it is applicable, at most might justify its accounting treatment of the bad debt against a charge of fraud or negligent failure to report income, issues we need not address. But it cannot negate the regulation and allow taxpayer to exclude income rather than report it and take a deduction. Therefore, Credit Life must deduct the bad debt in the year it filed its return to benefit from the regulation providing a conclusive presumption of worthlessness. Thus Credit Life has failed to satisfy both parts of the conclusive presumption of worthlessness regulation and has proffered no supportable or sufficient explanation for not doing so. The Claims Court, however, in an oral bench opinion, ruled that Credit Life was nevertheless entitled to rely on the regulation for the reason asserted by taxpayer: Substantial compliance with procedural requirements in regulations is sufficient to invoke a tax election. Plaintiff's List of Additional Authorities, Filed July 18, 1990 (Joint Appendix at 820–21).[3]

---

**3.** The oral bench ruling expressly incorporates by reference and adopts "the reasoning and authorities in" Credit Life's briefs and supplemental papers in support of its summary judgment motion. Transcript of July 19, 1990 Proceedings (Joint Appendix at 81). We therefore must consider those documents to contain the court's grounds of decision.

Although oral bench rulings are authorized by Rule 52, are often appropriate, economize scarce judicial resources, and certainly afford the parties an earlier decision, there are some cases in which their use can be troublesome. As we noted in *McKeague v. United States,* 788 F.2d 755, 758 (Fed.Cir.1986), the use of informal bench rulings in complex cases, unless very carefully done, can obscure the grounds of decision and thereby needlessly complicate or altogether preclude appellate review:

> There seems to be a growing tendency among some judges of the Claims Court to decide difficult and complicated legal and factual issues from the bench in an oral opinion that fails adequately to explain clearly the grounds of decision. In many cases, there is no adequate substitute for a carefully written

opinion, in which the court finds the facts, sets forth what it considers to be the governing legal principles, and applies those principles to the facts it has found. The lack of an adequate written opinion in such cases makes it more difficult, and sometimes impossible, for us properly to perform our appellate function, ...

"The danger of an oral opinion in a complex case is that the judge may fail to identify and resolve ... conflicts [in the evidence], leaving us to grope in the dark for the facts on which to base our review of the legal issues." *Okaw Drainage Dist. v. National Distillers & Chem.,* 882 F.2d 1241, 1244 (7th Cir.1989) (oral decision on a breach of contract claim after a three day bench trial). In addition, as we have said, "litigants are entitled to clarity and decisions on all issues raised." *American Broadcasting Cos. v. United States,* 851 F.2d 329, 333 (Fed.Cir.1988) (unexplained dismissal of one of four tax refund complaints vacated because it referred to a time period subject to earlier FCC rules than the three other complaints (citing *McKeague* )). As the Supreme Court stated in *United States v.*

## II

The Claims Court's reliance on the doctrine of "substantial compliance" is erroneous. Before the Claims Court, as here, Credit Life relied primarily upon decisions of the Tax Court for the proposition that "substantial compliance with regulatory requirements may suffice when such requirements are procedural and when the essential statutory purposes have been fulfilled." *American Air Filter Co. v. Commissioner*, 81 T.C. 709, 719 (1983) (citations omitted). *See also Fischer Indus., Inc. v. Commissioner*, 843 F.2d 224, 226 (6th Cir. 1988) (no substantial compliance with procedural requirements for an election of accounting method where there was "nothing in the returns themselves that would have given the Commissioner adequate notice that" an election had taken place); *Tipps v. Commissioner*, 74 T.C. 458, 468 (1980) (substantial compliance with procedural requirements for an election of accelerated depreciation of assets where there was no prejudice to the service because the same information had been provided on other IRS forms). We are not, of course, bound by the Tax Court decisions in *American Air Filter* or *Tipps*—this court has not extended their reasoning in the past, and we decline to do so now. Moreover, as to the Sixth Circuit's decision in *Fischer*, its requirements were not met here since the Commissioner did not get adequate notice. The regulation in *Fischer* is not comparable to the regulation in this appeal because the *Fischer* regulation contemplates that a statement of election "be made on form 970 pursuant to the instructions printed with respect thereto and to the requirements of this section, *or in such other manner as may be acceptable to the Commissioner*," 26 C.F.R. § 1.472–3(a) (1973) (emphasis added). By contrast, here Congress has expressly restricted the applicability of section 1.166–2(d)(1) so that a taxpayer can rely on the conclusive presumption of worthlessness for bad debts *only* if they are "claimed as a deduction by the taxpayer at the time of filing the return." 26 C.F.R. § 1.166–2(d)(1). Similarly, the regulation in *Tipps* merely required that "[t]he election to compute depreciation under section 167(k) with respect to any property must contain ... information" sufficient to identify the properties and expenditures as to which elections were being made. In contrast to the regulation here, the *Tipps* regulation did not restrict the means of satisfaction.

Whatever the breadth of the doctrine of substantial compliance as viewed by the Sixth Circuit, we prefer the view of the Seventh Circuit, in an opinion by Judge Posner for a unanimous court *en banc*, which criticized broad application of the substantial compliance doctrine:

Reading the Tax Court's decisions on the subject of substantial compliance is enough to make one's head swim. Tax lawyers can have no confidence concerning the circumstances in which non-compliance with regulations governing the election of favorable tax treatment will or will not work a forfeiture. The result has been a surge of unnecessary litigation well illustrated by the present suit. We think the doctrine should be interpreted narrowly, and point out that the courts of appeals owe no special deference to the Tax Court's legal views.... The common law doctrine of substantial compliance should not be allowed to spread beyond cases in which the taxpayer had a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or

---

*Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, "[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong." 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935) (conclusion that proposed rates would be "unreasonable" did not include a discussion of a "zone of reasonableness" for adjusting rates).

Here, it is unclear why the Claims Court judge concluded that the substantial compliance doctrine reached these facts and overcame the re-

quirement of the regulation. The instant judgment, however, unlike the one in *McKeague*, is reviewable without a remand for an articulation of the grounds of decision, because it did contain some articulation of reasons and because of its express adoption of the *reasoning* and *authorities* provided by Credit Life. Therefore, while a written opinion would have greatly facilitated our review, we cannot say an oral bench opinion should not have been used here or that this one was inadequate.

one unclearly or confusingly stated in the regulations or the statute. *Prussner v. United States*, 896 F.2d 218, 224 (7th Cir.1990) (*en banc*). Similarly, in *Bartlett v. Commissioner*, 937 F.2d 316 (7th Cir.1991), the Seventh Circuit held that the doctrine of substantial compliance is inapplicable where a surviving spouse failed to timely file a recapture agreement required by the Internal Revenue Code. In addition, the court indicated that the doctrine, when applicable, is limited to correcting minor errors in the recapture agreement and in the notice of election filed with a *timely* estate tax return. *Id.* at 321. In the instant appeal the notice was provided years later and thus, like the notice in *Bartlett*, could not be found to be timely.

As Credit Life correctly points out, in *Fehrs v. United States*, 556 F.2d 1019, 214 Ct.Cl. 74 (1977), one of our predecessor courts upheld an assertion of substantial compliance with respect to a regulation requiring filing of an agreement relating to stock redemptions. But the *Fehrs* court stated that "we emphasize the narrowness of our holding," *id.* 556 F.2d at 1027, which was limited to a situation clearly distinguishable from the instant case: There the taxpayer could not reasonably have expected that a certain filing would be necessary and filed as soon as he had notice. Here, on the other hand, it cannot be argued that Credit Life claimed a bad debt deduction at the earliest possible opportunity. Credit Life admits that it "intended to rely upon the conclusive presumption of Treas.Reg. § 1.166–2(d)(1) from the outset," Brief for Appellee at 27, and thus was on notice at the time it filed its return that it must claim the bad debt as a deduction. Yet it provided no notice to the IRS whatsoever on its return that it was relying on the regulation. Only years later, when the IRS discovered the exclusion from income in the course of an audit, did taxpayer assert its claim to the deduction. In any event, Credit Life is deemed to know the law and hence to know that the regulation requires the deduction in the return at the time of filing. *Fehrs*, then, does not provide support for taxpayer's position here.

Our cases have declined to expand the doctrine of substantial compliance beyond the narrow scope of *Fehrs*. In *Thomas Int'l, Ltd. v. United States*, 773 F.2d 300 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986), we held that "[s]ubstantive regulatory requirements must be complied with fully," and that a regulation providing that favorable tax treatment may only be elected when certain payments are made within sixty days of the end of a taxable year is a substantive rule not subject to substantial compliance. *Id.* at 305. Similarly, in *Cummins Engine Co. v. United States*, 923 F.2d 826 (Fed.Cir.1991), we rejected the argument that a requirement that an election as to the method of computing excise tax made in the return reporting the tax can be substantially complied with by claiming the election in a later claim for a refund. *Id.* at 830.[4] Here the regulation's requirement seems as "substantive" as that reviewed in *Thomas* and the potential prejudice from belated assertion as clear as that in *Cummins*. It is difficult to see how we could adopt taxpayer's view here without overruling *Thomas* and *Cummins*.

Moreover, even assuming, *arguendo*, that our precedent does not actually preclude Credit Life's arguments, this case would not seem to be an auspicious occasion on which to expand upon the very limited recognition of the substantial compliance doctrine in *Fehrs*. Unlike the Tax Court cases on which Credit Life seeks to rely, this is not a situation in which failure to comply with the regulation's reporting requirement does not prejudice the Service, *Tipps*, 74 T.C. at 468, or in which "the statutory purposes have been fulfilled." *American Air Filter*, 81 T.C. at 719. The purpose of the reporting requirement is obvious: Claiming a deduction places the Service on notice of the taxpayer's position and gives it an opportunity to investigate and verify entitlement to the deduction.

---

**4.** Although our opinion in *Cummins* did not use the term "substantial compliance," the taxpayer there relied on many of the same cases as Credit Life does here and its arguments were essentially that it had substantially complied.

But when a taxpayer does not claim a deduction, and instead simply fails to report income, the Service has no such notice and may not become aware that the taxpayer is claiming a bad debt unless, as occurred here, the issue happens to arise in the course of an audit initiated for other reasons.[5] Thus, to apply the doctrine of substantial compliance here would not only be inconsistent with our own cases limiting its application, but even with the Tax Court's application of it as well.

■ In sum, we decline to expand the very limited scope of the substantial compliance doctrine to embrace the instant situation. 26 C.F.R. § 1.166–2(d) specifically provides that a debt cannot be conclusively presumed worthless unless it was claimed as a bad debt deduction on the return in question at the time of filing. It is undisputed that Credit Life did not claim the Uniworld receivable as a deduction, but simply excluded it from gross income. Therefore, it may not rely on the regulation's conclusive presumption of worthlessness.

In holding that the regulation's conclusive presumption of worthlessness does not apply here, we decide only that Credit Life must prove, without reliance on the presumption, entitlement to the bad debt deduction.[6] Whether Credit Life is entitled to such a deduction is not at the present time before us, and we express no view as to whether taxpayer will ultimately prevail on this issue.

## CONCLUSION

We hold that the conclusive presumption of worthlessness in 26 C.F.R. § 1.166–2(d) applies only to debts as to which the taxpayer claimed a bad debt deduction on the tax return when filed, as the regulation explicitly provides, and that this provision can neither be ignored nor deemed satisfied under the doctrine of substantial compliance. It is undisputed that the bad debt deduction was not so claimed here. In any event, taxpayer's actions could not constitute substantial compliance because they prejudiced the Service by failing to give timely notice. The judgment of the Claims Court is therefore reversed and the case remanded for further proceedings consistent with this opinion.

## COSTS

Each party is to bear its own costs.

### REVERSED AND REMANDED

---

5. Indeed, the Supreme Court has noted that the difference between failing to report income, on the one hand, and understating a tax liability, is that in the former case

> the Commissioner is at a special disadvantage in detecting errors. In such instances the return on its face provides no clue to the existence of the omitted item. On the other hand, when ... the understatement of a tax arises from an error in reporting an item disclosed on the face of the return the Commissioner is at no such disadvantage.

*Colony, Inc. v. Commissioner,* 357 U.S. 28, 36, 78 S.Ct. 1033, 1038, 2 L.Ed.2d 1119 (1958).

6. As it is unnecessary to our decision, we express no opinion on the government's alternative argument that the Ohio Department of Insurance cannot be a "State authorit[y] maintaining substantially equivalent standards" within the meaning of § 1.166–2(d) because: (a) there is no analogous federal agency with supervisory authority over insurance companies; (b) the Ohio Department of Insurance's policies are not "substantially equivalent" to any federal standards; and (c) they are in any event too subjective to constitute "standards" within the meaning of the regulation.