**John P. McKEAGUE and Constance F. McKeague, Appellees,**

v.

**The UNITED STATES, Appellant.**

**Appeal No. 85-2630.**

United States Court of Appeals, Federal Circuit.

April 22, 1986.

Kenneth Greene, Tax Div., Dept. of Justice, Washington, D.C., argued for appellant. With him on brief were Michael L. Paup and Jonathan S. Cohen.

David A. Haist, Barnes & Thornburg, South Bend, Ind., argued for appellees. With him on brief were John L. Carey and Kenneth R. Petrini.

Before FRIEDMAN, Circuit Judge, BENNETT, Senior Circuit Judge, and NIES, Circuit Judge.

FRIEDMAN, Circuit Judge.

This is an appeal from a judgment of the United States Claims Court that the appellees recover from the United States in a refund suit the additional tax the Internal

Revenue Service assessed as a result of its disallowance of a deduction for attorney and accountant fees the appellees had paid in a private law suit. We vacate and remand for further proceedings.

I

A. This case grows out of a bitter dispute that arose between the appellee John P. McKeague (McKeague) and the company of which he was an officer, director, and stockholder, F.W. Dwyer Manufacturing Co., Inc., and its successor, Dwyer Instruments, Inc. (collectively referred to as Dwyer Company). The appellee Constance McKeague, McKeague's wife, is a party only because she and her husband filed a joint return.

The question is the deductibility of expenses (attorney and accountant fees) that McKeague incurred in litigation he brought against Dwyer Company and its two principal officers and stockholders as a result of a dispute he had with them regarding his employment with the company and the amount to which he was entitled for the sale to them of his stock in the company. The record describes in great detail the origins and course of this dispute. For purposes of this appeal, however, only a relatively small portion of that information is necessary.

In 1969, McKeague was an employee, stockholder, and director of Dwyer Company. Another employee was Edwin J. Clark (Clark). The president and major stockholder of the company was James G. Dwyer (Dwyer).

In that year, Dwyer Company was recapitalized because of Dwyer's wish to assure the continued operation of the company after his anticipated retirement ten years later. The recapitalization was designed to give McKeague and Clark equal control of the company after Dwyer's retirement.

In the recapitalization, the company sold an equal number of shares to McKeague and Clark at book value, as a result of which each of them owned 28 percent and Dwyer owned 30 percent of the stock. Portions of McKeague's and Clark's stock was placed in a voting trust which Dwyer, as voting trustee, could vote. In so voting, however, Dwyer was required to guarantee that McKeague and Clark would be minority directors of the company.

McKeague, Dwyer, and Clark also entered into an agreement requiring each of them to offer his stock in the company to the company and to each other before disposing of it to outsiders. The company's bylaws also were amended to require unanimous approval of the directors for the issuance or public sale of any stock, in order to prevent substantial diminution of the stockholdings of the three individuals.

As part of the recapitalization, McKeague, Clark, and Dwyer executed ten-year employment contracts with the company. These provided that McKeague and Clark were to be employed in an "executive capacity." Dwyer became chief executive officer, and McKeague and Clark became vice president of operations and of engineering and sales, respectively. McKeague and Clark were guaranteed a minimum salary of $40,000 a year and a bonus based on sales volume.

Between 1969 and 1974, there were frequent disagreements between McKeague and Clark. In November 1974, Dwyer appointed Clark president and McKeague administrative vice president. Thereafter Clark repeatedly reduced McKeague's duties and importance in the company. In 1976, Clark told McKeague that he was attempting to purchase additional shares from Dwyer and that McKeague would become vice president of industrial relations. Subsequently, the lawyer for the company and Dwyer informed McKeague that Dwyer wanted to buy McKeague's stock and remove him from the company.

Following a series of meetings, Dwyer offered to buy all of McKeague's stock for $700,000, which was approximately 60 percent of the book value of the stock, and to buy out the remaining three years of McKeague's employment contract for $120,000. McKeague accepted the offer of the buy-out of his employment contract but rejected the offer for his stock as inadequate. The Board of Directors then termi-

nated McKeague's employment and agreed to pay him $40,000 a year for the next three years.

During the following two years, Dwyer and Clark took various actions that were designed to eliminate McKeague from the company. Attempts to reach an agreement for the sale of McKeague's stock were unsuccessful.

In April 1978, McKeague filed suit in the United States District Court for the Northern District of Indiana against, among others, Dwyer, Clark, and the company. After trial, the district court held for McKeague. It found that Dwyer and Clark had engaged in a course of conduct designed to squeeze McKeague out of the company, had breached the agreements relating to the 1969 recapitalization and McKeague's employment contract, and had engaged in other improper conduct. The court indicated its proposed judgment.

Prior to the entry of that judgment, the parties settled the suit on substantially the same terms as those in the proposed judgment. McKeague sold his stock to Dwyer and Clark for $3,168,375, received $200,000 for breach of his employment contract, and agreed to resign as a director.

B. In his 1979 federal income tax return, McKeague deducted his total unreimbursed litigation expenses incurred in that year of $285,418, as a miscellaneous itemized deduction. The Commissioner ruled that a portion of those expenses was attributable to the disposition of McKeague's stock and therefore was not deductible as an expense under sections 162 or 212 of the Internal Revenue Code of 1954, 26 U.S.C. §§ 162, 212 (1976), but should have been added to McKeague's basis in the stock in determining his capital gain on the sale. Since the amount McKeague received on the sale of his stock represented 94 percent of the settlement, the Commissioner treated that percentage of the settlement as a capital expenditure and only the remaining $200,000 McKeague had received as damages for breach of his employment contract as an ordinary expense. The Commissioner assessed a deficiency based upon that allocation.

McKeague paid the deficiency, and when the Commissioner denied his claim for a refund, filed the present suit in the Claims Court. After a trial, the court held for the McKeagues.

Ruling from the bench, the Claims Court applied the "origin of the claim" doctrine to determine whether McKeague's litigation expenses were incurred to preserve a capital asset or to protect his position in the company. The court stated that "to determine the origin of the claim, it is necessary to look to the underlying claim or transaction that gave rise to the incurring of the expense," i.e., "to look to the event that prompted the party to sue." The court found "the sale of capital assets not to be the motivating force, but rather [found] the motivating force to be Plaintiff's prolonged but prevalent and watchful protection of his investment in DII to the best of his ability in any event."

The court further found that the acts of Clark and Dwyer following the 1969 recapitalization "were designed to deprise [sic] McKeague of his rights in DII [Dwyer Company]. And the subsequent U.S. District Court litigation arose out of McKeague's activities as an employee, officer, director, and income investor, and not out of a dispute as to the disposition of a capital asset." It found that the origin of the claim (McKeague's 1978 district court suit) was "the conservation and protection of property."

## II

In its appeal to this court, the government contends that the Claims Court misapplied the "origin of the claim" doctrine by failing to recognize that a claim may have more than one origin. It contends that McKeague's suit had a dual origin—the attempt by Clark and Dwyer (1) to eliminate him as a key officer of the company, and (2) to acquire his stock for an unfair price—and that the former aspect of the claim gave rise to an ordinary income deduction and the latter aspect to an increase in the basis of the capital asset (the stock). According to the government,

"[w]hen a claim has origins that are both capital and 'ordinary' in nature, the litigation expenses must be allocated between the capital and ordinary income components of the claim." The government cites a number of cases that applied the principle of allocation to situations where the claim had more than one origin. *See Parker v. United States*, 215 Cl.Ct. 773, 573 F.2d 42, 51–52, *cert. denied*, 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978); *accord Burch v. United States*, 698 F.2d 575, 579–80 (2d Cir.1983).

The appellees respond that the Claims Court correctly held that McKeague's litigation expenses were deductible from ordinary income because the origin of McKeague's suit was the attempts by Clark and Dwyer to freeze him out of the company. They also assert that in any event the method of allocation between capital and ordinary expenses the Commissioner used, which allocated 94 percent of the amount McKeague realized as a capital expense because that was the percentage of the total amount the parties allocated to the sale of the stock, was erroneous. Because of its holding that McKeague's claim was noncapital in origin, the Claims Court found it unnecessary to reach the allocation question.

We are unable to determine from the Claims Court oral opinion the basis of its ruling that the origin of the claim was noncapital. The government argued before the Claims Court that the claim had a dual origin, but McKeague seemingly disputed that contention. The only indication of the Claims Court's view on this point was its question to McKeague's counsel: "Well, I don't know if you can have more than one origin of the claim, can you?"

We cannot tell whether the court concluded as a matter of law that a claim could have only a single origin, as the quotation in the foregoing paragraph suggests, or whether the court found that although a claim might have multiple origins, the claim in this case in fact had only the single noncapital origin of protecting McKeague's position in the company. If the former was the basis of its decision, the court at least should have discussed the cases taking the contrary position and explained the ground upon which it either distinguished them or found them unpersuasive. If, on the other hand, the latter theory was the rationale of its decision, the court should have discussed the government's theory that the claim also had a capital origin and explained why it rejected that contention.

In short, the Claims Court failed to address a major issue in this case and to explain the reasons for its decision. The court's opinion does not adequately set forth the reasons for its conclusion, and we cannot determine whether its decision is correct. "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).

We therefore must remand the case to the Claims Court for it adequately to explain the reasons for its decision. That explanation must include a discussion of the issues we have dealt with in this opinion.

There seems to be a growing tendency among some judges of the Claims Court to decide difficult and complicated legal and factual issues from the bench in an oral opinion that fails adequately to explain clearly the grounds of decision. In many cases, there is no adequate substitute for a carefully written opinion, in which the court finds the facts, sets forth what it considers to be the governing legal principles, and applies those principles to the facts it has found. The lack of an adequate written opinion in such cases makes it more difficult, and sometimes impossible, for us properly to perform our appellate function, as this case illustrates.

The judgment of the Claims Court is vacated, and the case is remanded to that court for further proceedings in accordance with this opinion.

VACATED AND REMANDED.